# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

Mary Anne Brush,

       Plaintiff,

v.

Grosse Pointe Public School System, Ahmed Ismail, Lisa Papas, Sean Cotton, Virgina Jeup, *jointly and severally and in their individual and official capacities*,

       Defendants.

Case No. 4:24-cv-11495

Hon. F. Kay Behm

Magistrate Judge Curtis Ivy

---

MICHAEL L. PITT (P24429)
MEGAN BONANNI (P52079)
DANIELLE CANEPA (P82237)
*Attorneys for Plaintiff*
PITT MCGEHEE PALMER BONANNI & RIVERS P.C.
117 W. Fourth St. Suite 200
Royal Oak, MI 48067
(248) 398-9800
mpitt@pittlawpc.com
mbonanni@pittlawpc.com
dcanepa@pittlawpc.com

JEREMY D. CHISHOLM (P68915)
JOHN C. KAVA (P71919)
*Attorneys for Defendants*
COLLINS & BLAHA, P.C.
31440 Northwestern Highway, Suite 170
Farmington Hills, MI 48334
(248) 406-1140
jchisholm@collinsblaha.com
jkava@collinsblaha.com

TIMOTHY J. MULLINS (P28021)
GIARMARCO, MULLINS & HORTON P.C.
*Co-Counsel for Defendant Sean Cotton*
101 W. Big Beaver Road, 10th Floor
Troy, MI 48084-5280
(248) 457-7020
tmullins@gmhlaw.com

---

# DEFENDANTS GPPSS, AHMED ISMAIL, LISA PAPAS, AND VIRGINIA JEUP'S MOTION TO DISMISS PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)

**DEFENDANTS' GPPSS, AHMED ISMAIL, LISA PAPAS, AND VIRGINIA JEUP MOTION TO DISMISS PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)**

**Statement Regarding Concurrence: Statement Regarding Concurrence Pursuant to LR 7.1(a): The undersigned counsel certifies that counsel communicated in writing with opposing counsel, explaining the nature of the relief to be sought by way of this motion and seeking concurrence in the relief; Co-Defense Counsel for Defendant Sean Cotton has concurred in the relief sought. Plaintiff's Counsel did not concur in the relief sought.**

i

## TABLE OF CONTENTS

STATEMENT REGARDING CONCURRENCE ................................................. i

INTRODUCTION ........................................................................................ iv

ISSUES PRESENTED.................................................................................. viii

MOST CONTROLLING AUTHORITY................................................................. xi

STATEMENT OF FACTS ...............................................................................1

     I.     Creation of Communications Coordinator Position in
            2021 due to COVID-19 Pandemic ........................................1

            a.     The Communication Coordinator's Job Duties .....................2

     II.    GPPSS's Obligation to Maintain a Balanced Budget ..........................5

     III.   GPPSS's Budget Deficit During the 2022-2023 School
            Year ..........................................................................6

            a.     The 2022-2023 Board of Education............................7

            b.     GPPSS's Efforts to Balance the Budget ....................8

            c.     GPPSS' Elimination of BOTH Communications
                  Coordinator Positions................................................10

     IV.   Plaintiff's Retaliation Claims ..............................................12

LEGAL STANDARD....................................................................................16

LEGAL ARGUMENT...................................................................................18

     I.     DEFENDANTS ISMAIL, PAPAS, AND JEUP ARE
            ENTITLED TO ABSOLUTE LEGISLATIVE
            IMMUNITY ........................................................................18

     II.    DEFENDANTS ISMAIL, PAPAS, AND JEUP ARE
            ENTITLED TO QUALIFIED IMMUNITY ......................................19

            A.     Plaintiff Failed to State a *Prima Facie* Claim for
                  First Amendment Retaliation....................................20

B.    Plaintiff Failed to State a Cognizable *Prima Facie* Claim of First Amendment Retaliation......................................22

        i.    There are No Factual Allegations Establishing the Individual Defendants' Knowledge of Plaintiff's Protected Speech...................25

        ii    The Circumstances Dispel any Inference of Retaliation......................................................................26

C.    Plaintiff's First Amendment Retaliation Claim Fails Since She was a Confidential/Policymaking Employee ..................................................................28

D.    Plaintiff Failed to State a Substantive Due Process Claim ........................................................................35

E.    The Rights at Issue Are Not Clearly Established ....................36

III.    PLAINTIFF FAILS TO STATE A MONELL CLAIM AGAINST GPPSS.................................................................39

CONCLUSION ....................................................................................40

# INTRODUCTION

Plaintiff Mary Anne Brush has filed suit against Grosse Pointe Public School System (the "District" or "GPPSS"), Ahmed Ismail, Lisa Papas, and Virginia Jeup (collectively "the Defendants")[1], related to the elimination of her employment position at the District. Plaintiff has filed suit against the Defendants under 42 U.S.C. § 1983, alleging First Amendment retaliation and a substantive due process violation. Defendants Ismail, Papas, and Jeup are entitled to legislative and qualified immunity from these claims. Further, Plaintiff cannot establish municipal liability against the District without a showing of liability on the part of its officials. As such, Plaintiff's *Monell* claim against the District is subject to dismissal.

Plaintiff was a Communications Coordinator for GPPSS, which was a new position created in 2021 to address the communication needs caused by the COVID-19 pandemic. Plaintiff's position was eliminated in 2023 after the pandemic ended as part of over $4.6 million of necessary budget cuts to address a financial crisis. Accordingly, Plaintiff's position was one of forty-three (43) employment positions that were eliminated to address the deficit.

Plaintiff alleges that the Defendants Jeup and Papas targeted her position for elimination because she was a political "enemy." Further, Plaintiff alleges that

---

[1] Defendant Sean Cotton has filed a separate motion to dismiss. Therefore, all subsequent references to the "Defendants" do not include Defendant Sean Cotton.

Defendant Ismail, Board President at the time Plaintiff's position was eliminated, aided and abetted Jeup and Papas because he allegedly knew that Plaintiff's position was being targeted based on her political affiliations. Additionally, Plaintiff alleges that GPPSS is responsible for the harm caused by the Defendant Board members, as they acted on behalf of the District when eliminating Plaintiff's position.

Plaintiff's allegations lack any factual basis. Rather than accept the legitimate budgetary rationale for the elimination of her position, Plaintiff has instead constructed unfounded conspiracy theories to attribute the decision to personal or political motivations. The Plaintiff's lawsuit is nothing more than an attack on the Defendants' perceived political beliefs, which Plaintiff associates with extremist conservative ideology, and is rooted in Plaintiff's personal vendetta against the Defendants.

Plaintiff's lawsuit should be dismissed. At the outset, as members of the School Board, the Defendants are entitled to legislative immunity from Plaintiff's claims.

The Defendants Ismail, Papas, and Jeup are also entitled to qualified immunity. First, Plaintiff has not established a constitutional violation. The First Amendment retaliation claim fails because Plaintiff has not presented factual allegations demonstrating that the Defendants acted with the intent to terminate her based on her political beliefs. Plaintiff alleges that Defendant Jeup's alleged views

on book banning and other political topics somehow influenced the decision to eliminate her position. Plaintiff further contends that interactions with Defendant Papas' son demonstrate Papas' alleged animus toward her. As to Defendant Ismail, Plaintiff merely suggests guilt by association with the other Defendants. These speculative allegations fall far short of establishing a plausible First Amendment claim. It is unreasonable to conclude that alleged differences in political beliefs led to the elimination of Plaintiff's position, particularly where the public record makes clear the legitimate basis for the decision. GPPSS was required to cut nearly $5 million from its budget within a matter of weeks. As part of this effort, *all* Communication Coordinator positions were eliminated, as the temporary communication needs that initially justified their creation had ended. Plaintiff's attempt to reframe this budgetary decision as a politically motivated conspiracy lacks any factual or legal support.

Further, the retaliation claim fails for the additional reason that Plaintiff held a confidential or policymaking employee position. Based on Plaintiff's own allegations, she qualifies as a category three (3) confidential employee, as she controlled the lines of communication to and from the Superintendent and represented the District to the public on behalf of the Board of Education.

Plaintiff's substantive due process claims fail because she has no property interest in her position, and the elimination of her position was not arbitrary and capricious. Rather, it was for the purpose of addressing a budget deficit.

Even if it is questionable whether Plaintiff sufficiently alleged factual allegations supporting a constitutional violation, the Defendants are still entitled to qualified immunity from these claims. It is not clearly established that Plaintiff's constitutional rights were violated under the particularized facts presented here.

## ISSUES PRESENTED

**Issue One:** Local legislatures are entitled to absolute legislative immunity for claims arising out of their legislative activities while performing legislative functions. Given that the individual Defendants' vote to eliminate Plaintiff's Communication Coordinator position as a part of wide-ranging budget cuts is a legislative activity, are the individual Defendants entitled to absolute legislative immunity from Plaintiff's First Amendment Retaliation Claim?

**YES.**

**Issue Two:** A plaintiff fails to state a *prima facie* case for First Amendment Retaliation if the Plaintiff fails to plead facts that make it plausible that the plaintiff's engagement in protected speech was a substantial or motivating factor in the adverse employment action. Given that Plaintiff alleged no facts that would suggest that her position was eliminated because of her protected speech, no facts that would suggest that individual Defendants had knowledge of Plaintiff's engagement in protected speech, and because the budget deficit is an intervening even that dispels any inference of retaliatory motive, should this Court dismiss Plaintiff's First Amendment Retaliation Claim against the individual Defendants?

**YES.**

**Issue Three:** Even if the Plaintiff can meet her initial showing of a *prima facie* case of First Amendment Retaliation, a First Amendment Retaliation claim should

nevertheless be dismissed if the plaintiff's position was one that could be terminated based on the plaintiff's political affiliation under the *Branti/Elrod* exception if the plaintiff is a confidential or policymaking employee. Given that Plaintiff's position as the Communications Coordinator was one that controlled the lines of communication for the Board and the Superintendent, falling squarely under the *Branti/Elrod* exception as a category three (3) position, should this Court dismiss Plaintiff's First Amendment Retaliation claim against the individual Defendants? **YES.**

**Issue Four:** To state a substantive due process claim, the plaintiff must allege facts that make it plausible that the defendant deprived the plaintiff of a protected property or liberty interest and that the defendant's actions shocked the conscience. Since there is no recognized property or liberty interest in Plaintiff's Communications Coordinator position, and because eliminating a position for budgetary reasons can hardly be considered conscious shocking, should Plaintiff's substantive due process claim against the individual Defendants be dismissed? **YES.**

**Issue Five:** In order to show that a right at issue is clearly established, Plaintiff must point to Supreme Court or Sixth Circuit precedent that would suggest that any reasonable Board member would know that the individual Defendants' actions of eliminating Plaintiff's position would violate the First and Fourteenth Amendments.

ix

Given that there are no cases from the Supreme Court or Sixth Circuit that would suggest that individual Defendants' actions were unconstitutional, are the individual Defendants entitled to qualified immunity?

**YES.**

**Issue Six:** A school district may only have municipal liability under *Monell* if the Plaintiff alleges that a constitutional violation was caused by an official policy, widespread custom, or a decision by an individual with final policymaking authority. Given that Plaintiff failed to plausibly allege a constitutional violation, and further failed to identify any official policy, custom, or final policymaker decision that would support municipal liability, should Plaintiff's *Monell* claim against Defendant GPPSS be dismissed?

**YES.**

**MOST CONTROLLING AUTHORITY**

<u>**Absolute Legislative Immunity**</u>

- *Bogan v. Scott-Harris,* 523 U.S. 44, 49 (1998) (holding that a local legislature sued in his individual capacity under Section 1983 may invoke legislative immunity for claims arising out of their legislative activities); *Canary v. Osborn,* 211 F.3d 324, 328 (6th Cir. 2000) (same);

- *Smith v. Jefferson County Bd. of Sch. Comm'rs,* 641 F.3d 197 (6th Cir. 2011) (a school board is a legislative body entitled to legislative immunity); and

- *Collins v. Vill. of New Vienna,* 75 Fed. Appx. 486, 487-88 (6th Cir. 2003) (voting to eliminate a position for budgetary reasons is a legislative activity entitled to legislative immunity).

<u>**First Amendment Retaliation**</u>

- ***<u>Prime Facie Case</u>***

  - *Vereecke Huron Valley Sch. Dist.,* 609 F.3d 392, 400 (6th Cir. 2010) (quoting *Rogers v. Banks,* 344 F.3d 587, 602 (6th Cir. 2003)) (holding that to adequately plead a causal connection, the plaintiff "must point to specific, nonconclusory allegations linking [her] speech to [the adverse employment action].");

  - *Paterek v. Vill. of Armada, Mich.,* 801 F.3d 630, 646 (6th Cir. 2015) (discussing the elements for establishing causation for First

Amendment retaliation claims); *Paterek v. Vill. of Armada, Mich.,* 801 F.3d 630, 646 (6th Cir. 2015) (same);

- *Harbin-Bey v. Rutter,* 420 F.3d 571, 580 (6th Cir. 2005) (holding that "conclusory allegations of retaliatory motive unsupported by material facts will not be sufficient to state a... claim"); *Holzmer v. City of Memphis,* 621 F.3d 512, 525-26 (6th Cir. 2010) (holding that the plaintiff must point to evidentiary facts suggesting either direct or circumstantial evidence of retaliatory motive); and

- *Kuhn v. Washtenaw Cnty.,* 709 F.3d 612, 628 (6th Cir. 2013) (holding that an intervening event is a "legitimate reason to take an adverse employment action" and "dispels an inference of retaliation based on temporal proximity").

- **The *Branti/Elrod* Exception**

  - *Elrod v. Burns,* 427 U.S. 347, 367 (1976) (holding that a public employee can be discharged for their political beliefs or political affiliations when the employee is considered a confidential or policymaking employee); *Branti v. Finkel,* 455 U.S. 507, 517 (1980) (same); and

  - *Peterson v. Dean,* 777 F.3d 334, 343, 349 (6th Cir. 2015) (explaining the four (4) categories of positions that fall under the *Branti/Elrod*

Exception; the third (3) category encompasses positions that control the lines of communication for category one (1) or two (2) position holders).

- **<u>Substantive Due Process</u>**

  - *See Blazy v. Jefferson Cnty. Reg'l Plan. Comm'n,* 438 F. App'x 408, 414 (6th Cir. 2011) (holding that there is no recognized property interest in public employment for purposes of a substantive due process claim); and

  - *Cnty. of Sacramento v. Lewis,* 523 U.S. 833, 846-47 (1998) (holding that a defendant's action will only violate substantive due process "when it 'can properly be characterized as arbitrary, or conscious shocking, in a constitutional sense'").

- **<u>Qualified Immunity - Clearly Established Prong</u>**

  - *Ashford v. Raby,* 951 F.3d 798, 801 (6th Cir. 2020) (holding that to show that the right at issue is clearly established, the plaintiff must point to "existing precedent" at the time of the incident at issue that "put[s] the illegality of [the school officials'] conduct 'beyond debate'");

  - *Hall v. Navarre,* 118 F.4th 749 (6th Cir. 2024) (holding that plaintiff cannot defeat qualified immunity "simply by arguing that they have

a clearly established right not to suffer an 'abridgment' of the 'freedom of speech.'"); and

- *White v. Pauly,* 580 U.S. 73, 79 (2017) (holding that "'clearly established law' should not be defined at a 'high level of generality'—it 'must be particularized to the facts of the case.'").

## STATEMENT OF FACTS

### I.    Creation of Communications Coordinator Position in 2021 due to the COVID-19 Pandemic

In early 2020, COVID-19 struck. In March of that year, Governor Gretchen Whitmer issued an Executive Order closing all public school districts in Michigan due to the pandemic. Because of this, all Michigan public schools were required to transition to virtual learning. With this dramatic shift, the need to communicate with District families increased exponentially. At the time, GPPSS had only one (1) communications staff member, Communications Director Rebecca Fannon, making the communications workload overwhelming.[2] Nevertheless, GPPSS was able to handle the communications needs at this time with just Fannon.

Like many public school districts, GPPSS planned to begin its return to in-person learning in January 2021 (PageID.568-583). This transition was complex for Michigan schools and became a highly polarizing issue within local communities. As a result, the demand for communication between GPPSS and the public increased significantly (PageID.584, 2:46:57).

To support this transition, GPPSS recognized the need for additional staff to manage its growing communication demands. GPPSS determined that

---

[2] GPPSS traditionally operated with only one person responsible for District communications.

1

additional employees were necessary to assist Fannon in providing timely and effective communication to the public across various platforms (PageID.584, 2:46:57).

As a result, in early 2021, GPPSS created a new position: the Communications Coordinator position (PageID.476; PageID.585-596). GPPSS decided to hire two (2) Communication Coordinators at that time. GPPSS hired Mary Howlett on February 8, 2021, as a Communications Coordinator. (PageID.476; PageID.585-596). GPPSS then hired Plaintiff as a Communications Coordinator on February 22, 2021. (PageID.475-76; PageID.585-596). Both Communications Coordinator positions reported to the Superintendent and the Communications Director. (PageID.476-77). The three (3) communication-based positions formed GPPSS's "Communications Team."

    **a.    The Communication Coordinator's Job Duties**

As laid out explicitly by Plaintiff in her Amended Complaint, Plaintiff claims she held an influential position with the Superintendent of GPPSS, Dr. Jon Dean, and was responsible for preparing GPPSS's messaging to the community. Plaintiff asserts that in her position as the Communications Coordinator, she:

- "assisted the Superintendent in preparing information and content for effective and efficient communication of district initiatives and activities utilizing print and electronic platforms";

2

- "assisted in production of annual, quarterly, and weekly communication to internal and external stakeholders";

- "assisted in disseminating information and coordinating publicity for district events";

- "worked with the Superintendent to coordinate the communication and marketing strategies of schools";

- "gathered, wrote, and edited material to inform the public and the media of GPPSS initiatives and activities that support GPPSS's mission, goals, and strategic directions";

- "interfaced with Administration to maintain an effective and efficient flow of information to internal and external stakeholders";

- "played an integral role in emergency and crisis communications";

- "prepared reports and prepared print and video news stories and features for GPPSS's newsroom and promotional opportunities";

- "researched trends in education for the purpose of writing stories and promotional materials that could be disseminated to various audiences";

- "assisted the Administration in answering media inquiries and assisting reports covering school district activities";

- "assisted GPPSS employees in preparing for and participating in

media interviews and news conferences";

- "coordinated with District webmaster and graphic designers to ensure timely dissemination of news and information"; and

- "participated in staff trainings pertaining to writing, editing, public records management, and media relations."

(PageID.477-78). In short, Plaintiff asserts that she served as a central figure in GPPSS's communications efforts, acting as a trusted liaison to the Superintendent and facilitating communications between the administration, media, and community stakeholders. She managed sensitive communications, coordinated crisis responses, and ensured that messaging aligned with GPPSS's strategic goals, playing a vital role in shaping GPPSS's public image and maintaining internal and external transparency. Indeed, Plaintiff confirmed that she was "hired during Covid in part to win students back to the District" and "was doing 'branding' work all along" for GPPSS (PageID. 478).

Plaintiff's job duties were also discussed during a public Board of Education meeting held on June 20, 2023 (PageID.584). Plaintiff's job responsibilities as a Communications Coordinator were described as follows: (1) assisting the Superintendent in developing strategies for official communications to parents about school incidents and misunderstandings, ensuring alignment with GPPSS's goals; (2) responding to emails from parents on behalf of GPPSS; (3) writing, editing, and

distributing one to two newsletters to parents each week on behalf of GPPSS; (4) presenting in classrooms to give students support; and (5) taking photographs of classrooms and events with both teachers and students to be shared with parents and the community (PageID.584, 2:49:54-3:01:20). In short, Plaintiff's position was responsible for communicating GPPSS's message to the community.

As the impact of the COVID-19 pandemic began to subside, the District's operational circumstances shifted significantly. The Communications Coordinator position had been created in response to the heightened complexity and disruption caused by the pandemic. However, with the return to normal operations and in-person instruction, the need for the position diminished.

However, as the challenges of COVID-19 eased, a new obstacle emerged—a looming budget deficit.

## II.   GPPSS's Obligation to Maintain a Balanced Budget

Pursuant to statute, Michigan public school districts follow a fiscal year that runs from July 1 through June 30 of the following year. State law mandates that all public school districts maintain a balanced budget by June 30 each year (MCL § 388.1702), meaning a district's expenditures cannot exceed the total of its revenues and savings, known as "fund equity" (PageID.799-807). Failure to adopt a balanced budget can lead to serious financial and operational consequences. To comply with this mandate, Michigan public school districts typically begin developing the budget

for the upcoming school year about six (6) months in advance of the June 30 deadline. The responsibility for adopting a balanced budget ultimately falls on a school district's board of education (PageID.799-807).

## III.  GPPSS's Budget Deficit During the 2022-2023 School Year

During the 2022-2023 school year, GPPSS faced a substantial budget deficit. On November 28, 2022, GPPSS discovered that it had overestimated its fund equity for the 2022-2023 fiscal year budget by $2,434,123 (PageID.607, 00:41:24). As a result, GPPSS learned it needed to make nearly $5 million in budget cuts by June 30 in order to have a balanced budget for the next school year.

GPPSS's budget deficit was largely a result of the loss of student enrollment. Student enrollment is a critical factor in public school funding, as it directly determines the amount of state funding a district receives. Michigan public school districts are allocated a per-pupil amount from the state, known as the foundation allowance.

GPPSS has experienced a substantial decrease in student enrollment since 2011 (PageID.608-613). GPPSS had 8,471 students during the 2011-2012 school year (*Id.*). The number of students was reduced to 6,551 during the 2021-2022 school year (*Id.*). COVID-19 exacerbated the enrollment decline, as many students transferred to private schools, which did not close for in-person learning. In the 2022-2023 school year, GPPSS received $10,845 per student. Therefore, as GPPSS

lost approximately 2,000 students over the past decade, it consequently lost approximately $2 million in annual revenue. However, even though revenue declined, the cost of expenditures continued to increase, which contributed to the budget deficit (PageID.677-695).

GPPSS has been forced to make difficult decisions over the years to ensure the financial viability of the District and to maintain its goal of offering a top-notch education with a wide variety of electives. This included shutting down multiple school buildings, including Poupard Elementary School and Trombly Elementary School, and eliminating staff positions.

### a.    The 2022-2023 Board of Education

In November 2022, new board members were elected to the Grosse Pointe Public School System Board of Education. Defendant Jeup was one such new Board member who was elected in November 2022 (PageID 481).

In January 2023, when GPPSS was preparing its budget and proposed cost-cutting options, the following individuals were on the Board of Education: Valerie St. John, Virginia Jeup, Colleen Worden, Sean Cotton, Ahmed Ismail, David Brumbaugh, and Lisa Papas. Mr. Ismail was selected to serve as the President, Ms. Papas was selected to serve as Vice President, and Ms. Jeup was selected to serve as Secretary on January 4, 2023 (PageID.696-702).

### b.    GPPSS's Efforts to Balance the Budget

As a result of the $5 million projected deficit, the District began establishing parameters to guide necessary budget reductions in January 2023 (PageID.696-702). As Plaintiff concedes in the Amended Complaint, the Board of Education was responsible for setting the annual budget (PageID.500). The parameters were adopted by the Board at the February 13, 2023, publicly held Board meeting (PageID. 622-628; PageID.703-706; PageID.500). Immediately thereafter, GPPSS began identifying potential budget cuts, although the Board did not propose eliminating Plaintiff's position at that time.

At its March 20, 2023, open meeting, the Board considered multiple cost-containment measures and position eliminations to reduce the deficit (PageID.629, 00:22:34; PageID.630-666; PageID.501). Specifically, at the March 20, 2023 Board meeting, it was discussed that GPPSS needed to cut at least $3 million in support services based on the then-current financial projections. It was further discussed that 85% of GPPSS's current expenditures were spent on employees, which indicated that GPPSS had to reduce employee-based expenditures (PageID.629, 00:38:10). The administration proposed **$3,155,650** of cuts in support services (PageID.630-666). Plaintiff's position was once again not proposed for elimination at that time.

A Board meeting was held on April 10, 2023, to discuss the looming budget deficit. At the meeting, the Board considered a reduction of ten (10) employee

positions ("FTE"), which is equivalent to approximately **$1,300,000** in cuts to correspond with the decrease in enrollment (PageID.636). The proposed reduction of employee positions brought the initial proposed budget cuts to a total of **$4,455,650.** Plaintiff's position was notably not included among those proposed for elimination by the Board at that time.

On April 24, 2023, it was apparent there was not sufficient Board support to eliminate the middle school principal position, which would have resulted in a total savings of approximately $200,000 (PageID.607, 1:03:52). As a result, the proposed cuts were decreased to a total of **$4,255,650.** Therefore, additional cuts needed to be made. On May 2, 2023, the administration presented an updated budget to the Board, reflecting a projected decrease in the fund equity from $12,129,941 to $7,720,822, a total reduction of $4,409,119. (*Id.* at 00:43:28). In short, GPPSS was required to identify and implement significant additional cuts within the following 45 days.

The Board and the Administration discussed and negotiated various cuts between May 16, 2023, and June 1, 2023. These discussions involved cutting over forty (40) positions, not including Plaintiff's position. (PageID.517-518). A compromise was ultimately reached, resulting in a total of **$4,502,258** in cuts, **which resulted in the elimination of forty-three (43) staff positions** (PageID.667). at 02:44:58). Four (4) members of the Board actually wanted reductions totaling **$5,005,258.**

9

The Budget was presented to the Board and the public during a public hearing on June 12, 2023 (PageID.707-708; PageID.607, 00:40:21; PageID.709-731).

**c.   GPPSS' Elimination of BOTH Communications Coordinator Positions**

The Communications Coordinator positions were both eliminated as part of the reductions approved by the Board, which represented total cost savings of $220,436. Importantly, this was the first time that Plaintiff's position was proposed for elimination, after multiple rounds of deficit reduction proposals. As stated earlier, there were four (4) members of the Board—Cotton, Papas, Jeup, and Ismail—who actually wanted an additional $500,000 in reductions (PageID.732-771). The budget reductions were approved by the Board at a June 20, 2023, Board meeting (PageID.584).

The elimination of the two (2) Communications Coordinator positions made sense. The primary purpose of a school district is to educate students; therefore, school districts want to eliminate as few instructional staff members as possible. The Communications positions were not instructional positions.

Further, the Communications positions had only been in existence since February 2021 and were only created in response to the uncertainty caused by the COVID-19 pandemic. However, as the communication demands that initially justified the creation of these roles significantly declined, reducing the need for the positions.

10

Finally, the elimination of the Communication Coordinator positions provided significant financial savings. Plaintiff's Amended Complaint concedes that GPPSS achieved substantial financial savings from the restructuring of the Communications Department. Plaintiff asserts that after *all* of the Communications Coordinator positions were eliminated, Communications Director Fannon also resigned. Plaintiff claims that GPPSS replaced all three (3) positions with one (1) person being paid "$50,000 to $60,000 a year"—a substantial savings. Even with the approved reductions in costs, expenditures still exceeded revenue for GPPSS by $495,055, which is why Ismail, Papas, and Jeup advocated for another $500,000 in reductions.

Nearly two (2) years later, the District's financial position improved, resulting in a budget surplus of $1 million. Consequently, the District was able to create new positions. On December 9, 2024, the Board, with the support of Ismail, Papas, and Jeup, approved offering Plaintiff the Supervisor of Community Relations position (Exhibit 1), and on December 16, 2024, the District formally extended Plaintiff an offer for the role of Supervisor of Community Relations (Exhibit 2). Subsequently, on April 7, 2025, the District also extended an unconditional offer to Plaintiff for a vacant Communications Coordinator position (Exhibit 3). Plaintiff rejected the offer on April 24, 2025 (Exhibit 4).

11

## IV.   Plaintiff's Retaliation Claims

Despite the fact that over forty (40) staff positions were eliminated as part of the reductions—including *all* of the Communications Coordinator positions in GPPSS, not just Plaintiff's Communications Coordinator position—and the Communications positions were among the last proposed for elimination, Plaintiff claims that she was targeted for her political associations and participation in politically progressive activities. Plaintiff, in disparaging fashion, alleges that Defendants Jeup and Papas are "extremist" and politically conservative. Plaintiff contends that Jeup was elected as part of a conservative block, along with Cotton, a viewpoint with which Plaintiff asserts she disagrees.

Indeed, Plaintiff makes clear in her Amended Complaint that she disagreed with the direction of the fiscally conservative Board. Plaintiff even alleges that she got into a public argument with a conservative Board member over a political dispute. Yet, Plaintiff held a position with GPPSS in which she was responsible for publicly delivering the Board's message to the community.

However, there are no factual allegations in her Amended Complaint establishing that the individual Defendants knew of Plaintiff's alleged political activities or associations.

Plaintiff asserts that Defendant Jeup retaliated against her because their political views did not align. In support of this claim, Plaintiff references the 2022

Board of Education election, during which several articles were published highlighting the candidates' stances on various issues relevant to the District. Plaintiff alleges several candidates, including Jeup, were quoted in the article, expressing their opinions on topics such as book banning. Plaintiff characterized the election as "highly political," claiming it "pitt[ed] the liberal progressive members of the community against what was referred to as the 'MAGA Extremists.'" While Plaintiff attempts to draw a connection between Defendant Jeup's publicly stated beliefs and the decision to eliminate her position, Plaintiff lacks evidence to support such a causal link. School board elections involving politically charged issues are not uncommon, as elections often serve as forums for debate over extreme ideological differences, as was observed across the country in school boards during the COVID-19 pandemic. However, the mere existence of such political ideologies does not convert subsequent personnel decisions into motivation for constitutionally prohibited retaliation. Plaintiff fails to allege facts showing that Jeup had a retaliatory motive or took any adverse action against her because of her political views. Plaintiff also cites another article published during the same election that allegedly reported Jeup was present at the U.S. Capitol on January 6, 2021. This reference is irrelevant as Jeup's physical presence at such an event does not establish a specific political ideology, nor does it serve as evidence of retaliatory intent.

13

Plaintiff next alleges that Defendant Papas retaliated against her based on political differences. As evidence, Plaintiff references an incident on July 14, 2021, when she attended an event hosted by FEC United. Plaintiff claims she was asked to leave the event by Gregory Papas, Defendant Papas's adult son. However, Plaintiff provides no evidence establishing that Gregory removed her at the request of his mother. Accordingly, Plaintiff's reliance on Gregory's actions to help establish a retaliatory motive is not sufficient. Plaintiff further alleges that Papas referred to certain individuals as "leftist terrorists." However, Plaintiff does not allege that any of Papas' comments were directed at her. Therefore, Plaintiff falls short when attempting to use isolated statements made in different contexts to other people as it does not prove Papas engaged in retaliatory conduct toward Plaintiff. Plaintiff is grasping at any statements or conduct that reflect opposing political views in an effort to manufacture a theory of retaliation.

Plaintiff further alleges that Defendant Ismail "aided and abetted" Defendants Jeup and Papas by knowingly supporting their efforts to target Plaintiff based on her political beliefs, as evidenced by his vote to eliminate her position. The notion that Ismail's vote to eliminate Plaintiff's position as Communications Coordinator constitutes "aiding and abetting" is unfounded. School boards must often make difficult decisions in the best interest of the district, especially during times of financial difficulty. A school board member's vote to eliminate a position for

budgetary reasons, even if opposed by the affected employee, does not constitute a retaliatory act. If every board member risked "aiding and abetting" for simply voting in alignment with other members on controversial matters, the school board would be unable to function effectively. Plaintiff's allegations, rooted in speculation and ideological disagreement, fail to establish a motive for retaliation for Defendant Ismail.

Plaintiff further asserts a municipal liability claim against the District (i.e., a *Monell* claim), alleging that the elimination of her position violated her First and Fourteenth Amendment rights based on theories of retaliation and substantive due process. Plaintiff's claim against the District, like her claims against the individual Defendants, is factually deficient and must be dismissed pursuant to Fed. R Civ. Pro. 12(b)(6). Plaintiff has not pleaded any facts establishing that the elimination of her position was a constitutional violation. Plaintiff's attempt to reframe budget-driven personnel decisions as politically motivated constitutional violations is unsupported by the facts and grounded in speculation. Accordingly, Plaintiff's claims against the District are subject to dismissal.

## LEGAL STANDARD

The Defendants moves for a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). When evaluating a motion under Rule 12(b)(6), the Court is called upon to determine if the "complaint… contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 547 (2007)). A "claim is facially plausible when a plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Matthew N. Fulton, D.D.S., P.C. v. Enclarity, Inc.,* 907 F.3d 948, 951-52 (6th Cir. 2018) (quoting *Iqbal,* 556 U.S. at 678). "The facts cannot make it merely possible that the defendant is liable; they must make it plausible." *Agema v. City of Allegan,* 826 F.3d 326, 331 (6th Cir. 2016).

Conclusory allegations are not enough to survive a motion to dismiss. *Handy-Clay v. Memphis,* 695 F.3d 531, 539 (6th Cir. 2012). A plaintiff must also provide more than a "formulaic recitation of the elements of a cause of action," and his or her "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555-556 (2007).

When deciding a motion under Rule 12(b)(6), a court looks only to the pleadings, *Jones v. City of Cincinnati,* 521 F.3d 555, 562 (6th Cir. 2008), the documents attached to them, *Commercial Money Ctr., Inc. v. Illinois Union Ins. Co.,*

16

508 F.3d 327, 335 (6th Cir. 2007) (citing Fed. R. Civ. P. 10(c)), documents referenced in the pleadings that are "integral to the claims," *Id.* at 335-36, documents that are not mentioned specifically but which govern the plaintiff's rights and are necessarily incorporated by reference, *Weiner v. Klais & Co., Inc.,* 108 F.3d 86, 89 (6th Cir. 1997), abrogated on other grounds, *Swierkiewicz v. Sorema, N.A.,* 534 U.S. 506 (2002), and matters of public record, *Northville Downs v. Granholm,* 622 F.3d 579, 586 (6th Cir. 2010). "[W]hen a written instrument contradicts allegations in the complaint to which it is attached, the exhibit trumps the allegations." *Williams v. CitiMortgage, Inc.,* 498 F. App'x 532, 536 (6th Cir. 2012) (quoting *N. Indiana Gun & Outdoor Shows, Inc. v. City of S. Bend,* 163 F.3d 449,454 (7th Cir. 1998)).

# LEGAL ARGUMENT

## I.   DEFENDANTS ISMAIL, PAPAS, AND JEUP ARE ENTITLED TO ABSOLUTE LEGISLATIVE IMMUNITY.

The Supreme Court and the Sixth Circuit have recognized that when a plaintiff sues a local legislature under 42 U.S.C. § 1983 in their individual capacity, the local legislature may invoke legislative immunity for claims arising out of their legislative activities. *Bogan v. Scott-Harris,* 523 U.S. 44, 49 (1998); *Canary v. Osborn,* 211 F.3d 324, 328 (6th Cir. 2000). Legislative immunity grants absolute immunity to local legislatures, foreclosing personal liability for claims arising out of their legislative activities to local officials that were performing legislative functions. *Bogan,* 523 U.S. at 55. "The immunity granted… applies whether the relief sought is money damages[,] or [declaratory or] injunctive relief." *Alia v. Mich. Supreme Court,* 906 F.2d 1100, 1102 (6th Cir. 1990).

The Sixth Circuit has recognized that the board of education for a public school district is a legislative body. *See e.g., Smith v. Jefferson County Bd. of School Comm'rs,* 641 F.3d 197 (6th Cir. 2011). Additionally, the Sixth Circuit has expressly held that when a local legislative body, like a school board, votes to eliminate a position for budgetary reasons, it is the type of legislative activity that warrants the application of absolute legislative immunity. *See Smith,* 641 F.3d at 218-19 (holding that the teacher's Section 1983 claims brought against individual school board members in their individual capacities based on the school board's vote to abolish a

18

school must be dismissed based on legislative immunity); *Collins v. Village of New Vienna,* 75 Fed. Appx. 486, 487-88 (6th Cir. 2003) (holding that Village City Council members were entitled to absolute legislative immunity from the plaintiff's First Amendment Retaliation claims when they eliminated plaintiff's position).

Here, Plaintiff's Section 1983 claims brought against Defendants Ismail, Papas, and Jeup arise from their involvement in the preparation of the 2023-2024 budget and from their vote to approve the 2023-2024 budget that resulted in the elimination of Plaintiff's position. These are legislative functions that are entitled to absolute legislative immunity. Therefore, this Court should dismiss the Section 1983 claims brought against Ismail, Papas, and Jeup in their individual capacity.

## II.    DEFENDANTS ISMAIL, PAPAS, AND JEUP ARE ENTITLED TO QUALIFIED IMMUNITY.

Qualified immunity is an absolute defense to Section 1983 claims. *Binay v. Bettendorf,* 601 F.3d 640, 647 (6th Cir. 2010). The doctrine is designed to protect "all but the plainly incompetent who knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 341 (1986). These questions can be answered by the court as a matter of law. *See Dickerson v. McClellan,* 101 F.3d 1151, 1157 (6th Cir. 1996). Once a qualified immunity defense is raised, "the burden is on the plaintiff to demonstrate that the officials are not entitled to qualified immunity." *Binay v. Bettendorf,* 601 F.3d 640, 647 (6th Cir. 2010). To overcome a qualified-immunity defense, plaintiffs must show two things: (1) that government officials violated a constitutional right;

19

and (2) that the unconstitutionality of their conduct was clearly established when they acted. *District of Columbia v. Wesby,* 583 U.S. 48, 62-63 (2018).

**A.      Plaintiff Failed to State a *Prima Facie* Claim for First Amendment Retaliation.**

Based on a fair reading of the Amended Complaint, Plaintiff's First Amendment claim brought against Papas and Jeup is based on the allegation that her position was eliminated due to their opposing political beliefs. However, Plaintiff has failed to offer any evidence demonstrating that Papas and Jeup personally disagreed with her political ideologies or that such disagreement motivated the decision to eliminate her position. Additionally, Plaintiff's Amended Complaint asserts that Ismail aided and abetted the other individual Defendants by voting in alignment with them. Yet, Plaintiff offers no evidence to support this claim. As such, Plaintiff failed to prove a cognizable *prima facie* claim for First Amendment Retaliation under both theories for the reasons explained below. Plaintiff also contends that GPPSS is liable for the alleged harm caused by Defendant Board members, asserting that they acted on behalf of the District when they voted to eliminate her position. However, because Plaintiff has failed to establish any underlying liability on the part of the individual Board members, there is no basis for imposing liability on the District.

To state a *prima facie* cause of action for retaliation in violation of the First Amendment under Section 1983, a plaintiff must show (1) that she engaged in

constitutionally protected speech, (2) that she was subjected to adverse action, and (3) that the speech was a substantial or motivating factor in the adverse employment action. *Brandenburg v. Hous. Auth. of Irvine,* 253 F.3d 891, 897 (6th Cir. 2001).

Generally, a public employee may not be terminated based on their political beliefs or based on their political affiliation because it is typically constitutionally protected conduct. *Branti v. Finkel,* 445 U.S. 507 (1980). However, public employees that hold certain types of positions may be terminated based solely on their political affiliation without violating the First Amendment. *Id.; Elrod v. Bums,* 427 U.S. 347, 367 (1976). Thus, the plaintiff has the initial burden of showing that she was discharged because of her political affiliation. *Heggen v. Lee,* 284 F.3d 675, 681 (6th Cir. 2002) (citing *Hall v. Tollett,* 128 F.3d 418, 423 (6th Cir. 1997)). If the plaintiff can make her initial showing of a *prima facie* case of First Amendment retaliation, then the burden shifts to the defendant to show that the position was one that could be terminated based on the plaintiff's political affiliation under the *Branti/Elrod* exception.

Here, as explained in more detail below, Plaintiff failed to plead facts that would make it plausible that there is a causal connection between her position elimination and her engagement in protected conduct. Additionally, even if this Court were to disagree, Plaintiff's Communication Coordinator position is one that

falls under the *Branti/Elrod* exception, causing her First Amendment retaliation claim to fail as a matter of law.

### B. Plaintiff Failed to State a Cognizable *Prima Facie* Claim of First Amendment Retaliation.

Plaintiff has not plausibly pled that her engagement in alleged protected speech was a substantial or motivating factor in the adverse employment action. *Brandenburg,* 253 F.3d at 897.

To adequately plead a causal connection, the plaintiff "must point to specific, nonconclusory allegations linking [her] speech to [the adverse employment action]." *Vereecke Huron Valley Sch. Dist.,* 609 F.3d 392, 400 (6th Cir. 2010) (quoting *Rogers v. Banks,* 344 F.3d 587, 602 (6th Cir. 2003)); *See Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). The Sixth Circuit has interpreted causation in this context using a two-part inquiry: (1) whether the adverse employment action was proximately caused by the individual defendant's actions; and (2) whether the individual defendant, in taking those acts, was motivated in substantial part by a desire to punish the plaintiff for engaging in constitutionally protected conduct. *Paterek v. Vill of Armada, Mich.,* 801 F.3d 630, 646 (6th Cir. 2015) (citing *King v. Zamiara,* 680 F.3d 686, 695 (6th Cir. 2012)). "The true object of the injury is to determine whether the plaintiff has been retaliated against as a direct result of his or her protected speech." *Id.*

Under this causation standard, "conclusory allegations of retaliatory motive unsupported by material facts will not be sufficient to state a… claim." *Harbin-Bey*

*v. Rutter,* 420 F.3d 571, 580 (6th Cir. 2005). Instead, the plaintiff must point to evidentiary facts suggesting either direct or circumstantial evidence of retaliatory motive. *Holzmer v. City of Memphis,* 621 F.3d 512, 525-26 (6th Cir. 2010).

Moreover, the Sixth Circuit has "held that an intervening cause between protected activity and an adverse employment action dispels any inference of causation." *Kenney v. Aspen Techs., Inc.,* 965 F.3d 443, 450 (6th Cir. 2020). An intervening event is a "legitimate reason to take an adverse employment action" and "dispels an inference of retaliation based on temporal proximity." *Kuhn v. Washtenaw Cnty.,* 709 F.3d 612, 628 (6th Cir. 2013).

Plaintiff also cannot rely on temporal proximity alone to establish causation. "The law is clear that temporal proximity, standing alone, is insufficient to establish a causal connection for a retaliation claim." *Vereecke,* 609 F.3d at 400 (citing *Tuttle v. Metro. Gov't of Nashville,* 474 F.3d 307, 321 (6th Cir. 2007)). This is especially true where, as here, the fact of temporal proximity is not particularly compelling because "the plaintiffs retaliation claim [is] otherwise weak and there [is] substantial evidence supporting the defendant's version of the events." *Nguyen v. City of Cleveland,* 229 F.3d 559, 567 (6th Cir. 2000).

Rather, in addition to temporal proximity, the plaintiff must allege sufficient factual allegations of retaliatory motive. *See Hill v. Lappin,* 30 F.3d 468 (6th Cir. 2010). And "the more time that elapses between the protected activity and the

adverse employment action, the more the plaintiff must supplement [her] claim with other evidence of retaliatory conduct to establish causality." *Vereecke,* 609 F.3d at 400; *see also Williams v. Zurz,* 503 F. App'x 367, 373 (6th Cir. 2012). The Sixth Circuit has found that temporal proximity as little as four (4) months alone is insufficient to establish a causal connection. *See Hafford v. Seidner,* 183 F.3d 506, 515 (6th Cir. 1999); *see Cooper v. City of North Olmsted,* 795 F.2d 1265, 1272 (6th Cir. 1986) (finding that, where employer filed disciplinary notices only weeks after protected conduct and discharged plaintiff within four (4) months of the protected conduct, temporal proximity is insufficient to support an inference of retaliation).

Here, Plaintiff pleads no facts regarding temporal proximity. Plaintiff does not establish when, or even if, Ismail, Papas, or Jeup actually knew of her alleged political associations.

Instead, Plaintiff raises two (2) other circumstantial theories regarding retaliatory motive: (1) that Papas and Jeup targeted Plaintiff as a political enemy because of her alleged political alignment; and (2) that Ismail aided and abetted the other individual Defendants by voting to terminate Plaintiff's position. However, Plaintiff has not alleged "sufficient factual allegations of retaliatory motive" for two (2) reasons. *See Hill,* 30 F.3d 468. First, Plaintiff fails to make specific factual allegations establishing that Defendants Ismail, Papas, and Jeup were aware that

Plaintiff ever participated in any protected activity. Second, the circumstances dispel an inference of retaliation.

### i.   There are No Factual Allegations Establishing the Individual Defendants' Knowledge of Plaintiff's Protected Speech.

Plaintiff's Amended Complaint fails to contain the necessary factual allegations to establish causation. Plaintiff does not claim that the Defendants Ismail, Papas, and Jeup knew anything about Plaintiff's political beliefs and instead relies on her unsupported assumptions that Defendants' political beliefs are on the other end of the spectrum than her own. Plaintiff's failure to allege that Defendants Ismail, Papas, and Jeup were aware of her alleged engagement in protected speech is fatal. *See Handy-Clay v. City of Memphis Tenn.,* 695 F.3d 531, (6th Cir. 2012) (discussing that a lack of knowledge of the plaintiff's protected speech prevents the plaintiff from creating an inference of causation); *see Boxill v. O'Grady,* No. 2:16-cv-126, 2018 WL 11357552 (S.D. Ohio Mar. 30, 2018) (dismissing the plaintiff's First Amendment retaliation claim because of the plaintiff's failure to raise factual allegations that the individual defendants knew about her protected conduct).

Instead, Plaintiff's circumstantial evidentiary theories are based on speculation and conclusory assertions, which are insufficient. *See Honzu v. Doe #[1],* No. 2:22-cv-292, 2024 WL 231455 (S.D. Ohio Jan. 22, 2024) (holding that the plaintiff's reliance only on speculation that the adverse action was in response to protected conduct is insufficient to survive a motion to dismiss), *report and*

*recommendation adopted,* 2023 WL 3401156 (S.D. Ohio, July 12, 2024); *see Whiteside v. Collins,* No. 2:08-cv-875, 2009 WL 428143, at *9 (S.D. Ohio Nov. 24, 2009), *report and recommendation adopted,* 2010 WL 1032424, *afl'd* (Apr. 17, 2014).

### ii.     *The Circumstances Dispel any Inference of Retaliation.*

Indeed, this is a case where "the plaintiff's retaliation claim [is] otherwise weak and there [is] substantial evidence supporting the defendant's version of the events." *Nguyen,* 229 F.3d at 567. Moreover, to the extent the Court finds otherwise, any inference of retaliatory motive based on Plaintiff's circumstantial evidence is overcome by the legitimate, non-retaliatory reason for eliminating Plaintiff's position. See *Kuhn,* 709 F.3d at 628.

It is undisputed based on the public record that GPPSS experienced a significant financial crisis, and GPPSS was required to cut over $4 million dollars from its budget. Plaintiff's position **was one of forty-three (43) staff positions eliminated at the exact same time** to prevent deficit spending. The District's financial crisis serves as an intervening cause that dispels any plausible inference of retaliatory motive. The Sixth Circuit recognizes that an intervening event, which provides a legitimate reason for the adverse employment action, dispels any inference of retaliatory motive because it breaks the causal chain between the adverse action and protected activity. *See Kuhn,* 709 F.3d at 628.

The elimination of the Communications Coordinator positions as part of the budget cuts made sense. Plaintiff's position was one of the most expendable positions that was eliminated. The Communications Coordinator was not an instructional position and it only existed in GPPSS for two (2) years to accommodate the temporary communications need because of the COVID-19 pandemic. The reasons for the creation of the position were no longer present; therefore, the position was a prime choice for elimination. The elimination of the Communications Coordinator position was not motivated by retaliation. *See Vereecke,* 609 F.3d at 40 (holding that the plaintiff has not alleged "other evidence of retaliatory conduct to establish causality"). Rather, the elimination of the position was a sound business judgment, which should not be questioned. *Hartsel v. Keys,* 87 F.3d 795, 801 (6th Cir. 1996), *cert. denied,* 519 U.S. 1055 (1997). Courts should instead defer to sound business judgment to avoid "the illegitimate role of acting as a 'super personnel department' overseeing and second guessing employers' business decisions." *Bender v. Hecht's Dep't Stores,* 455 F.3d 612, 628 (6th Cir. 2006).

Moreover, Defendants Ismail, Papas, and Jeup had multiple opportunities to eliminate Plaintiff's position before it was proposed for elimination. However, the Board did not choose to eliminate the position until it was forced to make millions of dollars in eliminations in less than forty-five (45) days. The fact that the Board did not eliminate Plaintiff's position at the first, second, or even third opportunity

27

dispels any inference of retaliation. *See Lahar v. Oakland Cnty.,* 304 F. App'x 354, 359 (6th Cir. 2008) (holding that "the employer's restraint in not disciplining the employee closer in time to the protected conduct creates an inference of non-retaliation, not one of retaliation. An employer bent on retaliating against an employee is more likely to act as soon as the employee gives it the chance, not wait until a second or third problem arises-as happened in this case").

Therefore, Plaintiff failed to plead facts that make it plausible that she can establish a *prima facie* case of First Amendment retaliation.

### C.    Plaintiff's First Amendment Retaliation Claim Fails Since She was a Confidential/Policymaking Employee.

Even if this Court finds that Plaintiff can make an initial showing of retaliation, her claims should still be dismissed because Plaintiff's position was a confidential/policymaking position under the *Branti/Elrod* exception.

The dismissal of a public employee based on political beliefs or affiliations is generally prohibited by the First Amendment. However, in limited circumstances, these constitutional rights "bow to the government's interest in maintaining efficiency and effectiveness, or the need for political loyalty, and party affiliation may be a legitimate requirement for government employment." *Peterson v. Dean,* 777 F.3d 334, 341 (6th Cir. 2015) (citing *Elrod v. Burns,* 427 U.S. 347, 366-68 (1976)). The Supreme Court has explained that a public employee can be discharged for their political beliefs or political affiliations when the employee is considered a

confidential or policymaking employee. *Elrod v. Burns,* 427 U.S. 347, 367 (1976); *Branti v. Finkel,* 455 U.S. 507,517 (1980). This is referred to as the *Elrod/Branti* exception. *See e.g., Peterson v. Dean,* 777 F.3d 334, 341-42 (6th Cir. 2015).

The Supreme Court and the Sixth Circuit have explained the rationale for the *Elrod/Branti* exception, and have indicated that "'[l]imiting patronage dismissals to policymaking positions is sufficient to achieve' the valid governmental objective of preventing holdover employes from undermining the ability of a new administration to implement its policies." *Hall v. Tollett,* 128 F.3d 418, 422 (6th Cir. 1997) (quoting *Elrod,* 427 U.S. at 367); *see Rose v. Stephens,* 291 F.3d 917, 923 (6th Cir. 2002) (holding that "[w]hen such an employee speaks in a manner that undermines the trust and confidence that is central to his position, the balance definitively tips in the government's favor because an overt act of disloyalty necessarily causes significant disruption in the working relationship between a confidential employee and his superiors"). In contrast, when an employee is a non-policymaking employee, then they have "only limited responsibility and are therefore not in a position to thwart the goals of the in-party." *Elrod,* 427 U.S. at 367.

The determination of whether an employee is a confidential employee or policymaker, was explained by the Court as follows: "[i]n determining whether an employee occupies a policymaking position, consideration should also be given to whether the employee acts as an advisor or formulates plans for the implementation

29

of broad goals." *Elrod,* 427 U.S. at 367-68. The Court further explained that the nature of the employee's job responsibilities are critical. *Id.* at 367. "[T]he ultimate inquiry is not whether the label 'policymaker' or 'confidential' fits a particular position; rather the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." *Branti,* 445 U.S. at 518. Whether political affiliation is an "appropriate" consideration for the position is a question of law. *Sowards v. Loudon Cnty.,* 203 F.3d 426, 435 (6th Cir. 2000).

In applying the *Elrod/Branti* exception, the Sixth Circuit directs courts to examine the applicable state and local law to decide whether the position at issue is a confidential/policymaking position. To aid in this analysis, the Sixth Circuit indicated that there are four (4) categories of positions that fall under the *Elrod/Branti* exception:

> Category One: positions specifically named in relevant federal, state, county, or municipal law to which discretionary authority with respect to the enforcement of that law or the carrying out of some other policy of political concern is granted;

> Category Two: positions to which a significant portion of the total discretionary authority available to category one position-holders has been delegated; or positions not named in law, possessing by virtue of the jurisdiction's pattern or practice the same quantum or type of discretionary authority commonly held by category one positions in other jurisdictions;

> Category Three: confidential advisors who spend a significant portion of their time on the job advising category one or category two position

holders on how to exercise their statutory or delegated policymaking authority or other **confidential employees who control the lines of communications to category one positions, category two positions or confidential advisors;**

Category Four: positions that are part of a group of positions filled by balancing out political party representation, or that are filled by balancing out selections made by different governmental agents or bodies.

*Peterson,* 777 F.3d at 343 (quoting *Sowards,* 203 F.3d at 435-36 (emphasis added) (citations omitted). "If a particular position falls into one of these categories, then political affiliation is an appropriate consideration for that position and a public employee may be dismissed without violating the First Amendment." *Id.*

"A government position is not required, however, to fall neatly within one of the categories to be entitled to the *Elrod-Bran-Ji* exception." *Id.* Also, the exception is broadly construed so "if there is any ambiguity about whether a particular position falls into any of [the above four categories]", then "it is to be construed in favor of the governmental defendants." *Id.* at 343 *(citing McCloud v. Testa,* 97 F.3d 1536, 1542, 1557 (6th Cir. 1996)).

The third category of confidential/policymaking positions encompasses those government employee positions that control the lines of communication to category one (1) or category two (2) position-holders. *Peterson,* 777 F.3d at 349 (citations omitted). The basis for applying the *Elrod/Branti* exception to category three (3) positions is that they are positions that are concerned with the employee's access to

31

confidential, political information transmitted to the policymaker and are positions which require political loyalty. *Id* (citing *Sowards,* 203 F.3d at 437).

The Sixth Circuit has routinely held that a position's control of the lines of communication of category one (1) and two (2) positions renders that position a category three (3) position. *See Bauer v. Saginaw County,* 641 Fed. Appx. 510, 516 (6th Cir. 2016); *See Smith v. Sushka,* 117 F.3d 965, 971 (6th Cir. 1997) (holding that the administrative assistant to a county engineer was a category three (3) position); *see McCloud v. Testa,* 97 F.3d 1536 (6th Cir. 1996) (holding that the judge's law clerk was a category three (3) position). *Bauer v. Saginaw County* is illustrative. In *Bauer,* the court found that a legal office manager was a category three (3) position. *See* 641 Fed. Appx. at 516. The Sixth Circuit reasoned that the legal office manager position was "privy to confidential communications related to budget, administration of [the Prosecutor's] office and certain prosecutorial and political functions." The court also reasoned that the position served as a liaison between the courts, sheriffs' department, police agencies, and elected officials, which the plaintiff described as being the "eyes and ears" of the prosecutor's office. *Id*. Thus, the Sixth Circuit found it determinative that the position controlled the lines of communications to category one (1) positions, category two (2) positions, or confidential advisors. *See Id*.

Similarly, in *Aliff v. Parker,* 2002 WL 32005191 (S.D. Ohio July 23, 2002), the court found that a clerk position for a municipal court judge was a category three (3) position. Relying on the allegations contained in the complaint, and the statutes and rules setting forth the duties of the clerk position, the court was able to make the determination that the position fell under the *Branti/Elrod* exception as a matter of law. *Id.* at *9. In support of its finding that the position was a category three (3) position, the court reasoned:

> [T]he Clerk handles sensitive communications with the Judge and controls the lines of communication to the Judge with respect to certain matters. For instance, the Clerk is required to contact the Judge for a bond in a domestic violence case when a law enforcement officer makes a request to her. The Clerk is also responsible for communicating to the Judge requests for broadcasts and recordings. Further as in *Balogh,* the Clerk handles confidential communications from the Judge in that she may learn about, and be in a position to discuss, case dispositions before they are announced to the public.

*Id.* at *10 (full citations omitted). The court found that, as a matter of law, the clerk position fell within the *Branti/Elrod* exception; therefore, the court concluded that the defendant was entitled to take the plaintiff's political affiliation into account when deciding to retain her as the clerk. *Id.* at *11. As a result, the court found that the plaintiff could not prove any set of facts in support of her First Amendment claim that would entitle her to relief, warranting dismissal of the claim under 12(b)(6). *Id.*

*Hodges v. Van Buren County, Tennessee, is also persuasive, as the secretary position at issue there had nearly identical job duties as the* Plaintiff in the present

matter. *See* 227 F. Supp. 3d 907 (E.D. Tenn. 2017). Based on those duties, the court found that "[i]t similarly cannot be contested that Plaintiff was a 'confidential employee,'" as his position gave him access to confidential personal information and controlled the communications to the superintendent. The court found that "[o]n this record, therefore, it is clear that the Secretary/Accountant/Bookkeeper quite literally controlled the lines of communications to the County Road Superintendent." *Id.* at 922.

Similar to the cases cited above, Plaintiff "quite literally controlled the lines of communications to the… Superintendent" and the public on behalf of the Board. *Hodges,* 227 F. Supp. 3d at 922. The Amended Complaint and the public record both establish Plaintiff's job duties as the Communications Coordinator. The Communications Coordinator assisted the Superintendent in preparing information and content for effective and efficient communication of district initiatives and activities utilizing print and electronic platforms." (PageID.477). The Communications Coordinator position also controlled the lines of communication between the Board of Education, Administration, the public, parents, students, and the media. In the Amended Complaint, Plaintiff asserts that the Communications Coordinator position was central to GPPSS's communications efforts, where she acted as a trusted liaison between the Administration, media, and community stakeholders. She managed sensitive communications, coordinated crisis responses,

34

and ensured that messaging aligned with GPPSS's strategic goals, playing a vital role in shaping GPPSS's public image and maintaining internal and external transparency. Thus, the position falls within category three (3) for the same reasons articulated in *Bauer, Aliff,* and *Hodges.* Therefore, even if Defendants Ismail, Papas, and Jeup did target Plaintiff for her political association, this would not be a Constitutional violation under the *Branti/Elrod* exception.

### D.   Plaintiff Failed to State a Substantive Due Process Claim.

The substantive component of the Due Process Clause of the Fourteenth Amendment imposes certain limitations on government deprivations of life, liberty, and property. *See Pearson v. City of Grand Blanc,* 961 F.2d 1211, 1216 (6th Cir. 1992). To state a substantive due process claim, the plaintiff must allege facts that make it plausible that the defendant (1) deprived the plaintiff of a property or liberty interest; and (2) the defendant's actions shocked the conscience. *See Fouts v. Warren City Council,* 97 F.4ᵗʰ 459, 469 (6th Cir. 2024).

As to the first element, it is well established that there is no recognized property interest in public employment. *See Blazy v. Jefferson Cnty. Reg'l Plan. Comm'n,* 438 F. App'x 408, 414 (6th Cir. 2011) (citing *McClain v. NorthWest Comm. Corr. Ctr. Judicial Corr. Bd.,* 440 F.3d 320, 330 (6th Cir. 2006) (stating that an unclassified employee had no property interest under the Fourteenth Amendment in continued employment, notwithstanding a state regulation that provided some due

process protection). There is also no authority that would suggest that Plaintiff has a liberty interest in her Communications Coordinator position. This alone warrants dismissal of her substantive due process claim. *See Mays v. City of Flint,* No. 23-127052024 WL 4610769 (E.D. Mich. Oct. 29, 2024).

With respect to the second element, when the alleged violation concerns the specific act of a governmental officer, then the action will only violate substantive due process "when it 'can properly be characterized as arbitrary, or conscious shocking, in the constitutional sense.'" *County of Sacramento v. Lewis,* 523 U.S. 833, 846-47 (1998). The "conscious shocking" standard requires the most egregious official conduct to meet the standard. *Id* at 846. Here, it cannot be said that Defendants Ismail, Papas, and Jeup's actions of voting to approve the budget that included an elimination of Plaintiff's position, along with more than forty (40) other positions, are arbitrary or so egregious as to shock the conscience. Rather, it was consistent with Defendants Ismail, Papas, and Jeup's obligations under Michigan law. Therefore, Defendants Ismail, Papas, and Jeup's participation in eliminating Plaintiff's position cannot support a substantive due process claim. *See Painter v. Campbell County Bd. of Educ.,* 417 F. Supp. 2d 854, 864 (E.D.K.Y. 2006).

**E. The Rights at Issue Are Not Clearly Established.**

Even if a question could be raised as to whether Defendants Ismail, Papas, and Jeup violated Plaintiff's constitutional rights, that is not enough to impose

liability. The individual Defendants are entitled to qualified immunity if their conduct does not violate a "clearly established" constitutional right. *Pearson v. Callahan,* 555 U.S. 223, 231 (2009).

Plaintiff has the burden of establishing that the right at issue is clearly established. *Cunningham v. Shelby County,* 994 F.3d 761, 765 (6th Cir. 2021). Plaintiff must point to "existing precedent" at the time of the incident at issue that "put[s] the illegality of [the school officials'] conduct 'beyond debate.'" *Ashford v. Raby,* 951 F.3d 798, 801 (6th Cir. 2020).

The "clearly established" analysis starts with examining the United States Supreme Court and Sixth Circuit case law for similar cases. *See Stewart v. City of Euclid, Ohio,* 970 F.3d 667, 675 (6th Cir. 2020). Relying only on out-of-circuit decisions is insufficient. It is insufficient that the principle is merely suggested by the existing precedent. *Ashford v. Raby,* 951 F.3d 798, 804 (6th Cir. 2020); *Beck v. Hamblen Cty. Tennessee,* 969 F.3d 592, 603 (6th Cir. 2020); *Stewart v. City of Euclid, Ohio,* 970 F.3d 675 (6th Cir. 2020). Moreover, the Supreme Court recently reminded lower courts that "clearly established law should not be defined at a 'high level of generality'—it 'must be particularized to the facts of the case.'" *White v. Pauly,* 580 U.S. 73, 79 (2017); *see Beck v. Hamblen Cty. Tennessee,* 969 F.3d 592, 599 (6th Cir. 2020). For example, merely recognizing that the Fourth Amendment

bars the police from using excessive force is too general and will "not clearly establish that force was excessive on a particular occasion." *Beck,* 969 F.3d at 599.

Similarly, in *Hall v. Navarre,* 118 F.4th 749 (6th Cir. 2024), the Sixth Circuit explained that in the First Amendment context, a plaintiff cannot defeat qualified immunity "simply by arguing that they have a clearly established right not to suffer an 'abridgment' of the 'freedom of speech.'" *Id.* at 760 (citing *DeCrane v. Eckart,* 12 F.4th 586, 599 (6th Cir. 2021)). Instead, in a First Amendment retaliation case, the court indicated that the proper question was "whether [the officer] violated clearly established law by following an order to cite [the plaintiff] even where [the officer], as the district court seemingly inferred, maintained a speech-based retaliatory animus." *Id*. The 'existing precedent' must 'squarely govern' the specific facts at issue." *Tarter v. Metropolitan Nashville Airport Authority,* No. 22-5432, 2023 WL 5322418, at *5 (6th Cir. Aug. 18, 2023) (internal quotations omitted) (citing *Kisela v. Hughes,* 584 U.S. 100, 104 (2018)). The Court has explained that it is not enough that a right is "merely 'suggested by then-existing precedent'" and that "[s]pecificity is crucial." *Tarter,* 2023 WL 5322418, at *5 (citing *City of Tahlequah v. Bond*, 595 U.S. 9, 12 (2021); *see Moore v. Oakland County, Michigan,* 126 F.4th 1163 (6th Cir. 2025); *see e.g., MacIntosh v. Clous,* 69 F.4th 309 (6th Cir. 2023) (relying on *Zilich*, a sufficiently similar case since both cases involved a reasonable threat of harm and whether a reasonable government official would view that threat

as not protected under the First Amendment). Here, there are no Supreme Court or Sixth Circuit opinions decided under a similar factual pattern that finds a violation of the First or Fourteenth Amendment. Indeed, there are no such cases finding that eliminating a position for budgetary reasons is unlawful. In fact, as explained above, the Supreme Court and Sixth Circuit precedent establish the opposite. Therefore, the rights at issue were not clearly established, and Defendants Ismail, Papas, and Jeup are entitled to qualified immunity.

## III.    PLAINTIFF FAILS TO STATE A MONELL CLAIM AGAINST GPPSS

Plaintiff asserts a claim of municipal liability against Defendant GPPSS (i.e., a *Monell* claim), alleging the District violated her First and Fourteenth Amendment rights through retaliatory action and a deprivation of substantive due process. In *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658, 690-691 (1978), the United States Supreme Court held that to establish municipal liability pursuant to 1983, a plaintiff must allege an unconstitutional action that "implements or executes a policy statement, ordinance, regulation or decision officially adopted and promulgated by that body's officers" or a "constitutional deprivation[ ] visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decision-making channels." In other words, a plaintiff must show that the alleged federal right

violation occurred because of a municipal policy or custom. *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005); *cert den* 546 U.S. 814 (2005).

The District can only be held liable for a violation of the First and Fourteenth Amendment for retaliation and a violation of substantive due process if there is a showing of liability on the part of its officials. *Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 404 (6th Cir. 2010); *see also City of Los Angeles v. Heller,* 475 U.S. 796, 799 (1986) ("If a person has suffered no constitutional injury at the hands of the [municipality's] officer, the fact that the [policy, practice, or custom] might have authorized the use of constitutionally excessive force is quite beside the point.").

Here, for the reasons described above*,* Plaintiff has failed to state a plausible claim that any of the individual Defendants—Ismail, Papas, or Jeup—violated her constitutional rights under either the First or Fourteenth Amendments. Absent an underlying constitutional violation, there can be no basis for municipal liability against GPPSS. Accordingly, Plaintiff's *Monell* claim must be dismissed.

[The remainder of this page is intentionally left blank.]

## CONCLUSION

For all the reasons above, this Court should dismiss the claims brought against the individual Defendants based on legislative and qualified immunity. Additionally, the *Monell* claim against Defendant GPPSS should likewise be dismissed, as Plaintiff has failed to plausibly allege a constitutional violation by the individual Defendants sufficient to impose municipal liability.

Respectfully submitted,

John C. Kava (P71919)
Jeremy D. Chisholm (P68915)
Attorneys for Defendants
Collins & Blaha, P.C.
31440 Northwestern Highway, Suite 170
Farmington Hills, Michigan 48334
(248) 406-1140
jkava@collinsblaha.com
jchisholm@collinsblaha.com

DATED: August 11, 2025

# *Exhibit 1*



**Grosse Pointe Board of Education**
**Regular Meeting - December 9, 2024**
**MINUTES**
**Brownell Middle School**
**260 Chalfonte, Grosse Pointe Farms, MI 48236**

**Meeting Minutes**                                              **Encl: 6.3.**

1.   <u>CALL TO ORDER/PLEDGE OF ALLEGIANCE/ROLL CALL</u>

President Cotton called the meeting to order at 6:30 pm

**Board members present:**  Trustees:  Cotton, Jeup, Ismail, Collins, Worden, Papas, St. John
**Absent:** None
**Late Arrival:**  None

The Pledge of Allegiance was led by all in attendance.

**Also Present:**  Superintendent Dr. Andrea Tuttle, Dr. Roy Bishop, Dr. Chris Stanley, CFO Brandy Pavlik

2.   <u>APPROVAL OF THE BOARD AGENDA FOR DECEMBER 9, 2024</u>

President Cotton made a motion to move Public Comment on Trombly and Special Needs to right after the Trombly presentation. Then at 5.5 we have the Assistant Superintendent of HR, then at 5.9, we have a release the report to trustees, then move the Trombly Survey up from future action items. And discussing a different Trombly survey moving to 5.10. And then approval of Robertson Homes Purchase Agreement is 5.11. Last, to suspend the board policy for this meeting and make board member comments unlimited at the end of the meeting.

Trustee Papas made a motion to add an additional Item 8.5. regarding emails between a board member and the superintendent.

Trustee Worden made a motion to add Election of the Future officers and Approval of the Regular Board Meeting Calendar for 2025 to the January 7, 2025.

**It was Moved by:**  Trustee Cotton              **Supported by:**  Trustee Jeup

**THAT the Board approve to approve the Agenda for December 9, 2024, with the proposed changes, as presented.**

**Ayes:  Trustees: Cotton, Jeup, Ismail, Worden, Papas, St. John, Worden**
**Nays:  Trustee St. John**

**Motion carried 6-1 vote**
December 9, 2024
Regular Session

3.   **SUPERINTENDENT'S REPORT -  STUDENTS AND SCHOOL HIGHLIGHTS**

**A.  Maire/Defer Elementary—** Students from Defer gave a presentation on the 10-year Anniversary of Defer Elementary.  Students from Maire talked about their part in the Detroit Red Wings Promotional Extras.

**B.  Presentation of GPFPE Grants -** Cynthia Sloan presented the 2024 Fall Grants.

1. Books for Library, Classrooms and Students (Ages 3-5) Barnes ($2,000)

2. Bringing Books to Life (Ages 2-6) Barnes ($2,000)

3. Kerby's Rising Stars Destination Imagination Team (Young 5 to 4th grade) Kerby ($240)

4. Augmentative and Alternative Communication (Young 5 to 4th grade) Mason ($4,193)

5. Mason Book Vending Machine (Young 5 to 4th grade) Mason ($6,150)

6. Monteith and Mason Destination Imagination Team (Kindergarten and 1st grade) Monteith and Mason ($240)

7. Sensory Motor Room Start Up (Kindergarten to 4th grade) Monteith ($3,500)

8. Modernizing Middle School Workshop for 21st Century Skills and Safety (7th and 8th grades) Pierce ($7,800)

9. Headphones for ELA Classrooms (5th-8th grades) Parcells ($2,000)

10. Brass Roots Initiative: Adding Color to Advance the Ensemble Sound (5th -8th grades) Brownell ($6,600)

11. Replacement Stove and Oven for Special Education Classrooms (5th-8th grades) Parcells ($750)

12. General Assistance for the Gearheads-the Combined North and South FIRST Robotics Team (9th-12th grades) North and South ($2,500)

13. The Shoe Project (9th-12th grades) North ($2,000)

14. Comprehensible Input Readers for French (9th-12th grades) North ($535)

15. University Tours (11th-12th grades) South ($1,500)

16. Camera Lenses for Photography Classroom (9th-12th grades) South ($1,852)

17. Future City High School (9th-12th grades) South ($375)

18. Grosse Pointe Public School System Website (all students, schools and Grosse Pointe communities) District Wide ($50,000)

SEED (Social, Emotional, Encouragement and Development) Grants

1. Peer 2 Peer Program (9th to 12th grades) North ($2,500)

2. Fifth Grade Camp Support (5th grade) Parcells ($2,000)

3. Wellness Week (Kindergarten to 4th grades) Kerby ($500)

4. Sensory Corner (Ages 2 to 5) Barnes ($1,000)

5. Adaptive Swing Set with ADA Ramp (5th to 8th grades) Parcells ($4,328)

6. Parcells Student Union (5th to 8th grades) Parcells ($7,500)

7. Support Mannequin Project for French Students (9th to 12th grades) North ($300)

Total Fall GPFPE Grant Awards: $112,353

### C.  Acceptance of GPFPE Grants

**It was Moved by:** Trustee Cotton        **Supported by:**   Trustee Worden

**THAT the Board accept the GPFPE Grants, as presented.**

**Ayes:  Trustees: Cotton, Jeup, Ismail, St. John, Collins, Worden, Papas
Nays:  None**

**Motion carried 7-0 vote**

### D. Recognition of out-going Board Members

Dr. Tuttle highlighted the valuable contributions our outgoing board members have made to our district. Jackie Shelson, GPEA president, delivered a heartfelt speech honoring the outgoing board members.

### E. Recognition of 2024 Committee  Members

Dr. Tuttle emphasized our committee members' significant contributions to our district. She then introduced all of the committee members present.

### F. Trombly Presentation with Updated Information

Dr. Tuttle gave a detailed presentation on Trombly School.  Dr. Stanley offered a brief overview of the Trombly survey that will be going out to residents who reside within the Trombly boundaries.  Comments and questions from multiple board members followed this.

**There was a 5 minute break**

Dr. Tuttle shared the Snow Day policy that was sent out to the district.

4.        <u>**PUBLIC COMMENTS ON TROMBLY FOR DECEMBER 9, 2024**</u>

Renee Jakobowski, GPP, spoke about the importance of restoring Trombly
Janine Eckert, GPP, spoke about the importance of restoring Trombly
Michelle Hodges, Mayor, GPP, spoke about the importance of restoring Trombly
Peter M., student, discussed the cuts and loss of staff at North
Brendan Kaiser, GPP, spoke about the importance of restoring Trombly
James Creighton, GPP, discussed the big picture for the district, the sinking fund and 10 yr. strategy
Wendy Soubel, GPF, talked about the sinking fund and buildings
Matt Kahl, GPP, spoke about the importance of restoring Trombly
Tony Gatliff, GPP, spoke about the importance of restoring Trombly
Jimmy Seros, GPP, spoke about the importance of restoring Trombly
Jennifer Munson, GPP, spoke about the importance of restoring Trombly
Dick Schroeder, GPP, spoke about the importance of restoring Trombly
Chelsea Bauton, GPP, spoke about the importance of restoring Trombly
Monique Abshire, GPP, spoke about the importance of restoring Trombly
Luke Donahue, GPP, spoke about the importance of restoring Trombly
Richard Atkins, GPP, spoke about the importance of restoring Trombly
Jean Bean, GPP, spoke about the importance of restoring Trombly
Karen LaVere, GPP, spoke about the importance of restoring Trombly
Mark O'Keefe, GPP, discussed our lack of Special Ed educators
Julie Moe, GPW, discussed our lack of Special Ed educators

4.A.      <u>**PUBLIC COMMENTS ON AGENDA ACTION ITEMS FOR NOVEMBER 19, 2024**</u>

Jim Clark, Robertson Homes, discussed the Poupard Development
Valerie Kindle, Mayor of Harper Woods, asked to approve an extension on the Poupard Development
Jackie Shelson, GPEA, talked about the hiring process at Central Office
Tim Loughrin, Robertson Homes, discussed the Poupard Development
Christine Jacobs, GPF, talked about the hiring process at Central Office.
Rosie Knapp, GPF, requested a financial review before any further decisions are made.
Shannon Morgan, Renovare Development, discussed the importance of an extension for Poupard Schools

**There was a 15 minute break**

5.        <u>**AGENDA ACTION ITEMS FOR December 9, 2024**</u>

            5.1. <u>**APPROVAL OF REGULAR MEETING MINUTES FOR NOVEMBER 19, 2024**</u>

**It was Moved by:**  Trustee Cotton        **Supported by:**  Trustee Collins

**THAT the Board approve the Regular Meeting Minutes for November 19, 2024, as presented.**

**Ayes:  Trustees: Cotton, Jeup, Ismail, St. John, Collins, Worden, Papas**

**Nays:  None**

**Motion carried 7-0 vote**

### 5.2.  <u>APPROVAL OF SPECIAL SESSION MEETING MINUTES FOR NOVEMBER 18, 2024</u>

**It was Moved by:**  Trustee Cotton          **Supported by:**   Trustee Ismail

**THAT the Board approve the Special Session Meeting Minutes for November 18, 2024, as presented.**

**Ayes:  Trustees: Cotton, Jeup, Ismail, St. John, Collins, Worden, Papas**
**Nays:  None**

**Motion carried 7-0 vote**

### 5.3.  <u>APPROVAL OF FOIA COMMITTEE MINUTES FOR OCTOBER 14, 2024</u>

**It was Moved by:**  Trustee Cotton          **Supported by:**   Trustee Worden

**THAT the Board approve the FOIA Committee Minutes for October 14, 2024, as presented.**

**Ayes:  Trustees: Cotton, Jeup, Ismail, St. John, Collins, Worden, Papas**
**Nays:  Trustees: Worden and St. John**

**Motion carried 5-2 vote**

### 5.4.  <u>APPROVAL OF CENTRAL OFFICE PERSONNEL RECOMMENDATION</u>

Trustee Cotton motioned to approve the Central Office recommendation as stated.

**It was Moved by:**  Trustee Cotton          **Supported by:**   Trustee Jeup

**THAT the Board approve the Central Office Personnel Recommendation, as presented.**

President Cotton stated to amend this item to offer the Central Office Communications position to Mary Anne Brush.

Trustee St. John motioned to table the entire recommendation of Central Office Personnel until January, for the first budget amendment. This was followed by multiple questions and comments by board members.

**It was Moved by:**  Trustee St. John          **Supported by:**   Trustee Worden

**THAT the Board table the Central Office Personnel Recommendation until January, as presented.**

**Ayes:  Trustees:  St. John, Worden**
**Nays:  Trustees: Cotton, Collins, Jeup, Ismail, Papas**

December 9, 2024
Regular Session

5

**Motion failed 2-5 vote**

**It was Moved by:**  Trustee Cotton                    **Supported by:**  Trustee Jeup

**THAT the Board amend the Central Office Personnel Recommendation with the offer of the Supervisor of Communications position to MaryAnne Brush, as presented.**

**Ayes:  Trustees: Cotton, Jeup, Ismail, Collins, Worden, Papas**
**Nays:  Trustee: St. John**

**Motion carried 6-1 vote**

### 5.5. <u>APPROVAL TO HIRE MOUSSA HAMKA AS ASSISTANT SUPERINTENDENT OF HUMAN RESOURCES</u>

**It was Moved by:**  Trustee Cotton             **Supported by:**  Trustee Jeup

**THAT the Board approve to hire Assistant Superintendent of Human Resources, as presented.**

**Ayes:  Trustees: Cotton, Jeup, Ismail, Collins, Worden, Papas**
**Nays:  Trustee: St. John**

**Motion carried 6-1 vote**

**President Cotton made a Motion to extend the meeting by another hour**

**It was Moved by:**  Trustee Cotton             **Supported by:**  Trustee Papas

**THAT the Board extend the meeting by one hour, as presented.**

**Ayes:  Trustees: Cotton, Jeup, Ismail, St. John, Collins, Worden, Papas**
**Nays:  None**

**Motion carried 7-0 vote**

### 5.6. <u>APPROVAL OF THE HUMAN RESOURCES REPORT FOR DECEMBER 9, 2024</u>

**It was Moved by:**  Trustee Cotton             **Supported by:**  Trustee Ismail

**THAT the Board approve the Human Resources Report, as presented.**

**Ayes:  Trustees: Cotton, Jeup, Ismail, St. John, Collins, Worden, Papas**
**Nays:  None**

**Motion carried 7-0 vote**

### 5.7. <u>APPROVAL OF PERSONAL FINANCE STUDY</u>

**It was Moved by:** Trustee Cotton          **Supported by:** Trustee Worden

**THAT the Board approve the Personal Finance Study, as presented.**

**Ayes:  Trustees: Cotton, Jeup, Ismail, St. John, Collins, Worden, Papas**
**Nays:  None**

**Motion carried 7-0 vote**

### 5.8. <u>APPROVAL OF PROGRAM OF STUDIES FOR MIDDLE SCHOOL AND HIGH SCHOOL</u>

**It was Moved by:** Trustee Cotton          **Supported by:** Trustee Ismail

**THAT the Board approve the Program of Studies for Middle School and High School, as presented.**

**Ayes:  Trustees: Cotton, Jeup, Ismail, St. John, Collins, Worden, Papas**
**Nays:  None**

**Motion carried 7-0 vote**

### 5.9. <u>APPROVAL TO DIRECT CLARK HILL TO RELEASE THE REPORT TO ALL TRUSTEE'S</u>

**It was Moved by:** Trustee Ismail          **Supported by:** Trustee Collins

**THAT the Board approve to release the Report, as presented.**

**Roll Call:**

| | |
|---|---|
| **Trustee St. John** | **Yes** |
| **Trustee Worden** | **Yes** |
| **Trustee Jeup** | **Yes** |
| **Trustee Collins** | **Yes** |
| **Trustee Papas** | **Yes** |
| **Trustee Ismail** | **Yes** |
| **Trustee Cotton** | **Yes** |

**Motion carried 7-0 vote**

### 5.8. <u>APPROVAL TO DIRECT ADMINISTRATION TO ENGAGE A THIRD PARTY IN CREATING A SURVEY FOR THE TROMBLY DISTRICT</u>

Multiple questions and comments were made by board members.

**It was Moved by:** Trustee Cotton          **Supported by:** Trustee Papas

December 9, 2024
Regular Session

7

**THAT the Board approve to direct the Administration to engage a third party in creating a survey for the Trombly District, as presented.**

**Ayes:  Trustees: Cotton, Jeup, Ismail, St. John, Collins, Worden, Papas**
**Nays:  None**

**Motion carried 7-0 vote**

### 5.11. <u>APPROVAL OF EXTENDING THE ROBERTSON HOMES PURCHASE AGREEMENT</u>

Comments were made by Dr. Tuttle. Tim Loughlin spoke about extending the agreement. Legal Counsel, Joseph Colaianne, spoke about the extension. This was followed by multiple questions and comments from board members. Trustee Ismail made a motion to go into Closed Session with our attorney to discuss this change to the offer.

**It was Moved by:**  Trustee Ismail          **Supported by:**   Trustee Collins

**To go into Closed Session to discuss the amended Agreement, as presented.**

**Roll Call:**

| | |
|---|---|
| **Trustee St. John** | **No** |
| **Trustee Worden** | **No** |
| **Trustee Jeup** | **Yes** |
| **Trustee Collins** | **Yes** |
| **Trustee Papas** | **Yes** |
| **Trustee Ismail** | **Yes** |
| **Trustee Cotton** | **Yes** |

**Motion carried 5-2 vote**

**President Cotton made a Motion to extend the meeting by another hour**

**It was Moved by:**  Trustee Cotton          **Supported by:**   Trustee Papas

**THAT the Board extend the meeting by one hour, as presented.**

**Ayes:  Trustees: Cotton, Jeup, Ismail, St. John, Collins, Worden, Papas**
**Nays:  None**

**Motion carried 7-0 vote**

December 9, 2024
Regular Session

8

President Cotton stated that there is an amendment to be made to the motion made by Trustee Worden, the amendment is that the purchaser will cover the clean out cost of Poupard as well as give a non-refundable check in the amount of $5000, which would go towards the purchase price of $650,000.

**It was Moved by:** Trustee Cotton          **Supported by:**   Trustee Worden

**THAT the Board approve the amended Robertson Homes Purchase Agreement, as presented.**

**Roll Call:**

| | |
|---|---|
| **Trustee St. John** | **Yes** |
| **Trustee Worden** | **Yes** |
| **Trustee Jeup** | **No** |
| **Trustee Collins** | **Yes** |
| **Trustee Papas** | **No** |
| **Trustee Ismail** | **Yes** |
| **Trustee Cotton** | **Yes** |

**Motion carried 5-2 vote**

## 6.      DEPUTY SUPERINTENDENT REPORT

None

## 7.      AGENDA ACTION ITEMS FOR DECEMBER 10, 2024

**7.1.**    Board Election

**7.2.**    Approval of Regular Meeting Minutes for December 9, 2024

**7.3.**    Declaration of Board Member Compensation

**7.4.**    Approval of Resolution of Continuance of Funds and Designation of Signatories on Accounts

**7.5.**    Approval of Appointment of Representative to MAISL Joint Risk Management Trust

**7.6.**    Approval of Regular Board Meeting Calendar for 2025

## 8.      INFORMATION AND DISCUSSION

**8.1.** Monthly Financials/Check Register/Health Care Report

**8.2.** Legal Summary Analysis

**8.3.** Monthly Benchmark Report

**8.4.** Student Count Information

**8.5.** Information regarding emails

Trustee Papas read a complaint she had regarding emails between Trustee Worden and Dr. Tuttle.  Trustee Papas believed that Trustee Worden harassed Superintendent Tuttle.  This was followed by multiple comments from board members.

**9.      FUTURE MEETINGS**

> **9.1.** BOE Regular Meeting, Tuesday, January 7, 2025, 6:30 pm, Brownell MPR

**10.     PUBLIC COMMENTS ON NON-ACTION ITEMS**

Joshua Neds Fox, GPP, discussed the proposed parental rights policy that was published in the Grosse Pointe News.

Maureen Krasner, GPF, talked about comments that had been made about her by the board.

**11.     BOARD MEMBER/SUPERINTENDENT DISTRICT HIGHLIGHTS AND ACHIEVEMENTS COMMENTS**

**Trustee St. John** wished a happy holiday season to the outgoing board members.

**Trustee Worden** talked about her excitement with the new board in January, transparency and putting students first.

**Trustee Jeup** read a passage from her favorite book and expressed her gratitude to Trustees Collins, Papas, Ismail, and Cotton and thanked everyone for such a great year.

**Trustee Collins** discussed the details of the sale of Poupard and the future of Trombly. He closed with thanking everybody for his time on the board.

**Trustee Papas** talked about her reasons for running for the board in 2021 and all that has taken place during her time on the BOE.

**Trustee Ismail** thanked everyone for all they have done during his time on the board and talked about all they do for the district.  He congratulated the new board members and talked about the challenges ahead of them. He closed by thanking everyone.

**Superintendent Tuttle** talked about how she looks forward to her future with the district and wished everyone a happy holiday.

**President Cotton** discussed the Parental Rights Policy.  He also talked about transparency and how he hopes this next board follows this. He closed with saying goodbye to the outgoing board members and wished Grosse Pointe a Merry Christmas.

**14.     ADJOURNMENT**

President Cotton adjourned the meeting at 1:16 a.m.

_____
Secretary

December 9, 2024
Regular Session

*Exhibit 2*



**Department of Human Resources**
20601 Morningside Drive
Grosse Pointe Woods, MI 48236
Phone 313-432-3015
Fax 313-432-3011
Dr. Roy Bishop, Jr., Deputy Superintendent

December 16, 2024
Ms. Mary Ann Brush
1357 Bishop Road
Grosse Pointe, MI 48230

Dear Mary Ann,

Pursuant to the June 21, 2023, Layoff Letter, your position as Communications Coordinator was eliminated for economic reasons. The Grosse Pointe Public School System's (the "District's") financial circumstances have since changed. As a result, the Board of Education (the "Board") took action at the December 9, 2024, Board Meeting to create a Supervisor of Community Relations position. The Board took further action to offer the Supervisor of Community Relations position to you based on your qualifications and prior experience with the District.

This letter confirms that the District formally offers you the Supervisor of Community Relations position. A copy of the Job Description is attached to this letter. The start date for this position is tentatively January 6, 2025. Please inform me by December 23, 2024, if you accept the position of Supervisor of Community Relations.

Your salary for the 2024-2025 school year is $69,089, prorated. Your pay will be spread out over the remaining bi-weekly pay periods, including the summer. You will also be eligible for a full benefits package.

Your employment is contingent upon a clear criminal record check and a clear PA 189 investigation.

On behalf of the employees of the Grosse Pointe Public Schools, we welcome you back to the District. Should you have any questions, please contact me at (313) 432-3015.

Sincerely,

Dr. Roy Bishop
Deputy Superintendent for Educational Services

*Exhibit 3*



**Department of Human Resources**
20601 Morningside Drive
Grosse Pointe Woods, MI 48236
Phone 313-432-3015
Fax 313-432-3011
Dr. Roy Bishop, Jr., Deputy Superintendent

April 7, 2025
Ms. Mary Anne Brush
1357 Bishop Road
Grosse Pointe, MI 48230

Dear Mary Anne,

Pursuant to the June 21, 2023, Layoff Letter, your position as Communications Coordinator was eliminated for economic reasons. The Grosse Pointe Public School System's (the "District's") financial circumstances have since changed. As a result, the Board of Education (the "Board") took action at the December 9, 2024, Board Meeting to create a Supervisor of Community Relations position. The Board took further action to offer the Supervisor of Community Relations position to you based on your qualifications and prior experience with the District.

On December 16th, 2025, I sent you a letter formally offering you the Supervisor of Community Relations position. Since I sent that letter, we have had another open position in our communications department that we would like to offer you at this time due to a vacancy. We are offering you the vacant Communications Coordinator position. Due to your level of expertise, we are willing to offer you the position at the same rate of pay as the Supervisor of Community Relationships position. The start date for this position is tentatively May 1st, 2025. Please inform me by April 12, 2025, if you accept the position of Communications Coordinator.

Your salary for the 2024-2025 school year is $69,089, prorated. Your pay will be spread out over the remaining bi-weekly pay periods, including the summer. You will also be eligible for a full benefits package.

Your employment is contingent upon a clear criminal record check and a clear PA 189 investigation.

On behalf of the employees of the Grosse Pointe Public Schools, we welcome you back to the District. Should you have any questions, please contact me at (313) 432-3015.

Sincerely,

*Roy Bishop Jr.*



**Department of Human Resources**
20601 Morningside Drive
Grosse Pointe Woods, MI 48236
Phone 313-432-3015
Fax 313-432-3011
Dr. Roy Bishop, Jr., Deputy Superintendent

Dr. Roy Bishop
Deputy Superintendent for Educational Services

*Exhibit 4*

**From:** Danielle Canepa <dcanepa@pittlawpc.com>
**Sent:** Thursday, April 24, 2025 3:04 PM
**To:** John Kava <jkava@collinsblaha.com>; Tim Mullins <tmullins@gmhlaw.com>; Ken B. Chapie <kchapie@gmhlaw.com>; Annabel Shea <ashea@gmhlaw.com>
**Cc:** Michael Pitt <mpitt@pittlawpc.com>; Megan Bonanni <mbonanni@pittlawpc.com>; Taylor Greeson <tgreeson@collinsblaha.com>
**Subject:** Re: Communications Coordinator Offer

Hi John,

Thanks. We can provide a response on the Communications Coordinator offer. The offer was not made in good faith because the District unreasonably delayed in making the offer.  Accepting the late offer would disrupt Ms. Brush's current employer's communication program and there is no guarantee that if accepted she would be able to work in a non retaliatory and harassment free work environment. For these reasons, the offer is declined.

Many thanks,
Danielle

**From:** John Kava <jkava@collinsblaha.com>
**Sent:** Monday, April 21, 2025 12:14 PM
**To:** Danielle Canepa <dcanepa@pittlawpc.com>; Tim Mullins <tmullins@gmhlaw.com>; Ken B. Chapie <kchapie@gmhlaw.com>; Annabel Shea <ashea@gmhlaw.com>
**Cc:** Michael Pitt <mpitt@pittlawpc.com>; Megan Bonanni <mbonanni@pittlawpc.com>; Taylor Greeson <tgreeson@collinsblaha.com>
**Subject:** RE: Communications Coordinator Offer

---

**CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

---

Hi Danielle:

In follow-up to your original question, yes, the offer is unconditional.  Therefore, the lawsuit is not required to be dismissed for Ms. Brush to accept the offer.

Please let me know if you have any further questions regarding this matter.

Thank you,

John C. Kava
Attorney at Law
Collins & Blaha, P.C.
31440 Northwestern Highway, Suite 170
Farmington Hills, MI 48334
tel: (248) 406-1140
fax: (248) 406-8416
email: jkava@collinsblaha.com

This message originates from John Couture Kava. It contains information which may be confidential or privileged and is intended only for the individual or entity named above. It is prohibited for anyone else to disclose, copy, distribute, or use the contents of this message. All personal messages express views solely of the sender, which are not to be attributed to John Couture Kava and may not be copied or distributed without the disclaimer. If you received this message in error, please notify me immediately at Jkava@collinsblaha.com .

---

**From:** John Kava
**Sent:** Wednesday, April 16, 2025 3:06 PM
**To:** Danielle Canepa <dcanepa@pittlawpc.com>; Tim Mullins <tmullins@gmhlaw.com>; Ken B. Chapie <kchapie@gmhlaw.com>; Annabel Shea <ashea@gmhlaw.com>
**Cc:** Michael Pitt <mpitt@pittlawpc.com>; Megan Bonanni <mbonanni@pittlawpc.com>; Taylor Greeson <tgreeson@collinsblaha.com>
**Subject:** RE: Communications Coordinator Offer

Hi Danielle:

I am further discussing your question with the District and will be back in touch with a response.

Thank you,

John C. Kava
Attorney at Law
Collins & Blaha, P.C.
31440 Northwestern Highway, Suite 170
Farmington Hills, MI 48334
tel: (248) 406-1140
fax: (248) 406-8416
email: jkava@collinsblaha.com

This message originates from John Couture Kava. It contains information which may be confidential or privileged and is intended only for the individual or entity named above. It is prohibited for anyone else to disclose, copy, distribute, or use the contents of this message. All personal messages express views solely of the sender, which are not to be attributed to John Couture Kava and may not be copied or distributed without the disclaimer. If you received this message in error, please notify me immediately at Jkava@collinsblaha.com .

---

**From:** Danielle Canepa <dcanepa@pittlawpc.com>
**Sent:** Tuesday, April 15, 2025 12:14 PM
**To:** John Kava <jkava@collinsblaha.com>; Tim Mullins <tmullins@gmhlaw.com>; Ken B. Chapie <kchapie@gmhlaw.com>; Annabel Shea <ashea@gmhlaw.com>

**Cc:** Michael Pitt <mpitt@pittlawpc.com>; Megan Bonanni <mbonanni@pittlawpc.com>; Taylor Greeson <tgreeson@collinsblaha.com>

**Subject:** Fw: Communications Coordinator Offer

Hi John,

Let me know if you have any further information on my message from last week.

Many thanks again,
Danielle

---

**From:** Danielle Canepa
**Sent:** Thursday, April 10, 2025 4:04 PM
**To:** jkava@collinsblaha.com <jkava@collinsblaha.com>
**Subject:** Communications Coordinator Offer

Hi John,

Our client received this letter on Monday. Is Ms. Brush required to dismiss her lawsuit in order to accept the offer? Let us know if this is an unconditional offer or otherwise what conditions apply.

Many thanks,

Danielle

**Danielle Y. Canepa**  |  **Attorney**

Pitt McGehee Palmer Bonanni & Rivers

117 W. Fourth Street, Suite 200

Royal Oak, MI 48067 3848

dcanepa@pittlawpc.com

Office:  248 398 9800

Cell:  734-417-7017

PITT · MCGEHEE
PALMER · BONANNI · RIVERS

THE INFORMATION CONTAINED IN THIS EMAIL MAY BE CONFIDENTIAL, SUBJECT TO THE ATTORNEY-CLIENT PRIVILEGE, AND MAY CONSTITUTE PRIVILEGED WORK PRODUCT. This information is intended only for the use of the individual or intended recipient, or the agent or employee responsible for delivering it to the intended recipient. You are hereby notified that any use, dissemination, distribution or copying of this communication may be subject to legal restrictions and/or sanctions. If you have received this e-mail in error, please notify us immediately by telephone to arrange for return or destruction of the information and all copies. Thank you.

## Disclaimer

The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authori ed to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

This email has been scanned for viruses and malware, and may have been automatically archived by Mimecast, a leader in email security and cyber resilience. Mimecast integrates email defenses with brand protection, security awareness training, web security, compliance and other essential capabilities. Mimecast helps protect large and small organi ations from malicious activity, human error and technology failure; and to lead the movement toward building a more resilient world. To find out more, visit our website.

## Disclaimer

The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

This email has been scanned for viruses and malware, and may have been automatically archived by Mimecast, a leader in email security and cyber resilience. Mimecast integrates email defenses with brand protection, security awareness training, web security, compliance and other essential capabilities. Mimecast helps protect large and small organizations from malicious activity, human error and technology failure; and to lead the movement toward building a more resilient world. To find out more, visit our website.

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

Mary Anne Brush,

      Plaintiff,

v.

Grosse Pointe Public School System, Ahmed Ismail, Lisa Papas, Sean Cotton, Virginia Jeup, *jointly and severally and in their individual and official capacities*,

      Defendants.

Case No. 4:24-cv-11495
Hon. F. Kay Behm
Magistrate Judge Curtis Ivy

---

MICHAEL L. PITT (P24429)
MEGAN BONANNI (P52079)
DANIELLE CANEPA (P82237)
*Attorneys for Plaintiff*
PITT MCGEHEE PALMER BONANNI & RIVERS P.C.
117 W. Fourth St. Suite 200
Royal Oak, MI 48067
(248) 398-9800
mpitt@pittlawpc.com
mbonanni@pittlawpc.com
dcanepa@pittlawpc.com

JEREMY D. CHISHOLM (P68915)
JOHN C. KAVA (P71919)
*Attorneys for Defendants*
COLLINS & BLAHA, P.C.
31440 Northwestern Highway, Suite 170
Farmington Hills, MI 48334
(248) 406-1140
jchisholm@collinsblaha.com
jkava@collinsblaha.com

TIMOTHY J. MULLINS (P28021)
GIARMARCO, MULLINS & HORTON P.C.
*Co-Counsel for Defendant Sean Cotton*
101 W. Big Beaver Road, 10th Floor
Troy, MI 48084-5280
(248) 457-7020
tmullins@gmhlaw.com

---

## PROOF OF SERVICE

    The undersigned certifies that on August 11, 2025, a copy of Defendants GPPSS, Ahmed Ismail, Lisa Papas, and Virginia Jeup's Motion to Dismiss Pursuant To Federal Rule Of Civil Procedure 12(b)(6) with Exhibits was served upon the attorneys of record in this matter at their stated business address as disclosed by the records herein via electronic filing system.

I, Taylor M. Greeson, declare under the penalty of perjury that the foregoing statement is

true to the best of my information, knowledge and belief.

_____
Taylor M. Greeson

Subscribed and sworn to before me
This 11th day of August 2025.

_____
Isabella Hickey, Notary Public, State of Michigan
Oakland County, Acting in Oakland County
My commission expires: October 3, 2028