UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARY ANNE BRUSH,

      Plaintiff,

                                  Case No. 24-11495

v.

                                  F. Kay Behm

GROSSE POINTE PUBLIC           U.S. District Judge
SCHOOL SYSTEM, *et al.*,

      Defendants.

_____/

## <u>OPINION AND ORDER ON MOTIONS TO DISMISS (ECF Nos. 27, 45)</u>

### I.     PROCEDURAL HISTORY

Plaintiff, Mary Anne Brush, filed this civil rights action against Defendants on June 7, 2024.  (ECF No. 1).  With the permission of the court, Plaintiff filed an Amended Complaint on May 12, 2025.  (ECF No. 26).  Defendant Sean Cotton filed a motion to dismiss or for judgment on the pleadings on May 22, 2025.  (ECF No. 27).  This matter is fully briefed.  (ECF Nos. 34, 38).  The remaining Defendants (Grosse Pointe Public School System, Ahmed Ismail, Lisa Papas, and Virginia Jeup) filed a motion to dismiss the Amended Complaint on August 11, 2025.  (ECF No. 45).  This matter is fully briefed.  (ECF Nos. 54, 56).  The court held a hearing on the pending motions on January 7, 2026.

For the reasons set forth below, the motions to dismiss are **GRANTED** in part and **DENIED** in part.

## II.     FACTUAL BACKGROUND

The Grosse Pointe Public School System ("GPPSS" or "the District") hired Plaintiff Mary Anne Brush in February 2021.  (ECF No. 26, ¶ 11).  At that time, the District created two Communications Coordinator positions as permanent positions.  *Id*. ¶ 12.  The salary was paid out of the general fund, not the pandemic fund used for temporary hires.  *Id*.  The District also hired a second Communications Coordinator, Mary Howlett, during the same period.  *Id*. ¶ 15. Both Communications Coordinators reported to Rebecca Fanon, the Communications Director, who had been with GPPSS since 2005, and the Superintendent, Dr. Jon Dean.  *Id*. ¶¶ 16-17.

As a Communications Coordinator, Brush "assisted the Superintendent in preparing information and content for effective and efficient communication of district initiatives and activities utilizing print and electronic platforms; Brush gathered, wrote, and edited material to inform the public and the media of GPPSS initiatives and activities that support the District's mission, goals, and strategic directions; Brush interfaced with the Administration to maintain an effective and efficient flow of information to internal and external stakeholders; Brush played

an integral role in emergency and crisis communications; Brush prepared reports and prepared print and video news stories and features for the District's newsroom and promotional opportunities; Brush researched trends in education for the purpose of writing stories and promotional materials that could be disseminated to various audiences; Brush assisted the Administration in answering media inquiries and assisting reporters covering school district activities; Brush assisted GPPSS employees in preparing for and participating in media interviews and news conferences; Brush assisted in production of annual, quarterly, and weekly communication to internal and external stakeholders; Brush coordinated with District webmaster and graphic designers to ensure timely dissemination of news and information; Brush participated in staff trainings pertaining to writing, editing, public records management, and media relations; Brush assisted in disseminating information and coordinating publicity for district events; Brush attended School Board meetings and workshops when appropriate; Brush worked with the Superintendent to coordinate the communication and marketing strategies of schools." *Id*. ¶¶ 17-18.  Brush performed duties for which other schools frequently hired outside consultants.  *Id*. ¶ 19.

The Deputy Superintendent for Educational Services, Dr. Roy Bishop, worked closely with Brush on a number of district initiatives as part of the 2022-

2024 GPPSS Strategic Plan, including diversity initiatives.  *Id*. ¶¶ 22-23.  Efforts to improve racial equity were a priority in the Strategic Plan and for Dr. Bishop.  Brush worked with Dr. Bishop to implement certain DEI initiatives.  For example, Brush attended diversity task forces and prepared a school calendar to include more religious holidays and diversity days to reflect the District's diverse residents.  *Id*. ¶¶ 22-23.  Brush had no performance issues and "was always evaluated as highly effective." *Id*. ¶ 21.

Following a heated election period, *see id*. ¶¶ 38-44, Sean Cotton and Virginia Jeup won seats on the GPPSS school board in November 2022.  *Id*. ¶¶ 33-34.  Together with Ahmed Ismail and Lisa Papas, they secured a conservative majority.  *Id.* ¶ 33.  The Amended Complaint details Defendants' association with what Plaintiff characterizes as outside the mainstream of conservative views.  Defendant Jeup attended the January 6th insurrection at the U.S. Capitol and supports banning certain books in schools.  *Id.* ¶ 42.  Defendant Papas is a member of FEC United, which the Southern Poverty Law Center has listed as an extreme anti-government organization.  *Id*. ¶ 46.

The Amended Complaint details Defendant Cotton's alleged history of personal retaliation based on political affiliation.  As reported in The Detroit News: "the Grosse Pointe News, owned by school board candidate Sean Cotton,

routinely attacks politicians, candidates, school administrators and residents considered progressive." *Id*. ¶¶ 38-39 (quoting The Detroit News, Michigan's school board races have turned into emotional battlegrounds (Oct. 31, 2022)). Further, the Amended Complaint alleges that "Defendant Cotton had already fired Brush once before she started working at GPPSS because of his perception of her political views." *Id*. ¶ 79.  Cotton and Brush previously crossed paths in 2019, when Brush was working as an investigative reporter for the Grosse Pointe News. ¶ 81.  In 2019, Brush investigated an anonymous group, "Save Our Schools," which launched a recall campaign against three members of the GPPSS Board of Education.  *Id*. ¶¶ 80-89.  The recall website described a plan to recall certain Board members and then secure a majority on the Board of Education in order to remove the Superintendent and Assistant Superintendent.  *Id*. ¶¶ 84-85.  Brush investigated allegations that Sean Cotton and his family were funding the anonymous recall campaign in order to eliminate the Superintendent and Assistant Superintendent.  *Id*. ¶¶ 88, 93.  The following year, in December 2020, Sean Cotton acquired the Grosse Pointe News.  *Id*. ¶ 94.  Cotton terminated Brush immediately after acquiring the paper, in retaliation for her investigation into the recall.  *Id*. ¶ 96.  She was hired by GPPSS two months later.  *Id*. ¶ 11.

According to the Amended Complaint, a few months after she was hired at GPPSS, Defendant Papas's son attempted to have her removed from a political event based on the belief that Brush is an "Antifa journalist" and a "leftist terrorist." *Id.* ¶ 51. On July 14, 2021, Brush attended an FEC United event at the Grosse Pointe Yacht Club called "Michigan Conservatives Take Back Michigan 2024," which was organized by Defendant Papas and her son Gregory Papas. *Id.* ¶¶ 52, 54. Brush attended with Shannon Byrne ("Byrne") and Christine Wujek ("Wujek"). *Id.* ¶ 56. Byrne is the President and a founder of WeGP (Welcoming Everyone Grosse Pointe), an advocacy group for LGBTQ+ rights and other social justice issues in Grosse Pointe. *Id.* ¶ 57. Wujek is another politically active member of the community, particularly for LGBTQ+ rights. *Id.* ¶ 59. After Brush was seated at the event, Gregory Papas approached her and asked, "Are you Mary Anne Brush?" *Id.* ¶ 61. When Brush confirmed her identity, Gregory Papas asked her to leave the meeting. *Id*. When Brush asked Gregory Papas if he was related to Lisa Papas, he responded, "She's my mother." Brush then asked if she was involved with the event. He replied, "She is one of the facilitators." *Id.* ¶ 61. Brush stood her ground and refused to leave. *Id*. ¶ 62. She told Gregory Papas that she had paid her $10 fee to attend, and it had been billed as a public event open to anyone. *Id*. Gregory Papas responded by stating that in fact it was a

private event, and the organizers had refunded her $10 and wanted her to leave.

*Id*.  When Brush asked why the organizers wanted her to leave, Gregory Papas said

"Because you are an Antifa journalist, and we know why you are here."  *Id.* ¶ 63.

He claimed Brush had been "spreading lies."  *Id*.  Brush responded to Gregory

Papas: "I have done no such thing.  In fact, I'm not even currently working as a

journalist.  I paid my money and I have every right to be here."  *Id*.  Brush stood

her ground and refused to leave.  Later that month, the Grosse Pointe News

reported Defendant Papas sent a Facebook message to a community member

calling her "trash and a leftist terrorist."  Grosse Pointe News, July 20, 2021.  *Id.*

¶ 64.

In February 2023, the Board of Education approved parameters for a $4

million cost reduction in the district's budget.  *Id*. ¶ 106.  According to the

Amended Complaint, school district policy provides a separation of powers:

"Under GPPSS policy, the Board of Education was responsible to set the budget

and the Administration, led by the Superintendent, were responsible to specify

and implement the budget."  *Id*. ¶ 107.  "This division of duties is standard for

school district governance."  *Id*. ¶ 108.  In accordance with GPPSS policy,

"[f]ollowing the Board's direction to achieve a $4 million cost reduction in the

budget, the Administration conducted a lengthy, collaborative process to meet the

budget parameters." *Id*. ¶ 109.  Administration leadership, including the Superintendent, the Deputy Director of Finance & Ops, the Administrative team, and all the Building Principals, conducted budget meetings for several months to develop a new budget.  *Id.* ¶ 110.  Defendant Cotton had no role in drafting the budget.  "Members of the Board of Education did not attend these budget meetings." *Id.* ¶ 111.

"In March 2023, the Administration presented a draft budget to the Board of Education which met the Board's budget parameters."  *Id.* ¶ 112.  "The administration did not recommend cutting the communications coordinator position held by Brush in the proposed budget reductions."  *Id.* ¶ 113.  The Administration's proposed budget did eliminate the other Communications Coordinator position.  *Id.* ¶ 129.  One month earlier, in February 2023, Brush's counterpart Mary Howlett had voluntarily resigned to pursue other opportunities. *Id*. ¶ 115.  Then, in May 2023, Board members Cotton, Papas, Jeup and Ismail asserted that deeper cuts were required.  *Id.* ¶ 115.

The Amended Complaint alleges that in May, "Cotton, in violation of policy and past practices, took it upon himself to create a 'Treasurer's Compilation'" of "additional cuts, including the position of Communications Coordinator."  *Id.* ¶ 116.  This was the first time Brush's position was identified for elimination.  *Id.*

¶ 121.  It was co-signed by Cotton and Papas.  *Id.* ¶ 120.  The Amended Complaint alleges Cotton's decision to propose his own budget violated District policy.  "According to District policy and past practices, once the cost savings amount is established by the Board, it is within the sole discretion of the Administration to decide the best way to implement those reductions."  *Id.* ¶ 117.  The Administration, meanwhile, revised its budget proposal.  On May 16, 2023, consistent with District policy and past practice, the Superintendent proposed a revised budget that did not eliminate Brush's position of Communications Coordinator.  *Id.* ¶ 118.

On May 22, 2023, the Board of Education considered two budget proposals: the revised budget from the Administration and the Treasurer's Compilation prepared by Cotton and Papas.  The Board rejected the Administration's budget.  Instead, contrary to policy and past practices, Cotton and the conservative majority rejected the recommendations of the Superintendent and imposed their own budget through a Resolution entitled "Trustee-Initiated Budget Adjustment" based on the Treasurer's Compilation.  *Id.* ¶ 122.  The Trustee-Initiated Budget Adjustment called for the elimination of Brush's Communications Coordinator position.  *Id.* ¶ 123.  During this nine-hour school board meeting, members of the

public addressed the Board and stated that the Board was targeting Brush for political reasons.  *Id.* ¶ 124.

To bring order to the situation, on May 31, 2023, Superintendent John Dean prepared a spreadsheet summarizing all proposed cuts, titled 2023-2024 Budget Adjustments Resolution.  *Id.* ¶ 125; ECF No. 26-1.  The 2023-2024 Budget Adjustments Resolution shows how Defendants targeted Brush.  *Id.* ¶ 127.  Columns titled "Initiated By" indicate the source of each proposed cut and columns titled "Support By" indicate who supported each proposal.  *Id.* ¶ 126.  The document shows which cuts were supported by the Administration, which were supported by the Trustee's Compilation, and which had mutual support.  *Id*.

In the 2023-2024 Budget Adjustments Resolution, both Communication Coordinator positions are proposed for elimination, but under very different circumstances.  *Id.* ¶ 128.  The other Communications Coordinator, Mary Howlett, had resigned in February 2023, a few months earlier.  *Id.* ¶ 129. The Administration proposed to eliminate that position because Howlett had already left.  *Id*.  "This cut had mutual support from the Administration and the Treasurer's Compilation."  *Id.* ¶ 129; ECF No. 26-1.  "But Brush's Communications Coordinator position, listed later near the end of the document, was only initiated by the Treasurer's Compilation and was supported only by that group.  The

10

Administration is not listed in support to eliminate the second Communications Coordinator position held by Brush." *Id*. ¶ 130; ECF No. 26-1.

The Amended Complaint alleges that Brush was the only District employee specifically targeted for elimination in the "Treasurer's Compilation" proposed by Cotton. *Id*. ¶ 120. The 2023-2024 Budget Adjustments Resolution lists just two positions for elimination "initiated by" the Treasurer's Compilation. Brush's role is first on the list, with no explanatory notes. ECF No. 26-1, PageID.518. Second is a Counselor position listed with the note: "not replacing retiree." *Id*. Brush was the only person selected for termination in Cotton's proposed budget. Notably, Cotton's Treasurer's Compilation proposed adding funds of $45,000 for a "Enrollment Marketing Study" and "Branding Study" to replace Brush's duties. *See id*.; ¶ 144.

At an open Board meeting on June 20, 2023, Cotton, Papas, Jeup and Ismail voted to eliminate Brush's position. *Id*. ¶ 131. Trustee St. John made two motions to retain the remaining Communications Coordinator position held by Brush. *Id*. Both failed 3-4. *Id*. Both times, Defendants specifically voted to eliminate Brush. Id. After Brush was terminated, the District hired a former classroom teacher with no professional communications experience to run communications at a salary in

11

the $50-60,000 range.  *Id*.  The District also hired a marketing and branding firm to

some of perform Brush's work.  *Id.* ¶¶ 144-145.

### III.   ANALYSIS

#### A.   Standard of Review

In deciding a motion to dismiss under Rule 12(b)(6), the court "must

construe the complaint in the light most favorable to the [nonmoving party] ...

[and] accept all well-pled factual allegations as true*." League of United Latin Am.

Citizens v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007); *see also Yuhasz v. Brush

Wellman, Inc.*, 341 F.3d 559, 562 (6th Cir. 2003).  The complaint must provide "'a

short and plain statement of the claim showing that the pleader is entitled to

relief,' in order to 'give the defendant fair notice of what the ... claim is and the

grounds upon which it rests.'"  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 545

(2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  Moreover, the

complaint must "contain[ ] sufficient factual matter, accepted as true, to state a

claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 677

(2009).

A complaint is subject to dismissal for failure to state a claim if the

allegations, taken as true, show the plaintiff is not entitled to relief, such as "when

an affirmative defense ... appears on its face."  *Jones v. Bock*, 549 U.S. 199, 215

(2007) (quotation marks omitted).  A claim has "facial plausibility" when the nonmoving party pleads facts that "allow[ ] the court to draw the reasonable inference that the [moving party] is liable for the misconduct alleged."  *Id*. at 678. However, a claim does not have "facial plausibility" when the "well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct." *Id*. at 679.  The factual allegations "must do more than create speculation or suspicion of a legally cognizable cause of action; they must show entitlement to relief."  *League of United Latin Am. Citizens*, 500 F.3d at 527.  Showing entitlement to relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Ass'n of Cleveland Fire Fighters v. City of Cleveland*, 502 F.3d 545, 548 (6th Cir. 2007) (quoting *Twombly*, 550 U.S. at 555).

In evaluating the allegations in the complaint, the court must be mindful of its limited task when presented with a motion to dismiss under Rule 12(b)(6).  At the motion-to-dismiss stage, the court does not consider whether the factual allegations are probably true; instead a court must accept the factual allegations as true, even when skeptical.  *See Twombly*, 550 U.S. at 555 (a court must proceed "on the assumption that all the allegations in the complaint are true (even if doubtful in fact)"); *id*. at 556 ("[A] well-pleaded complaint may proceed even if it

strikes a savvy judge that actual proof of the facts alleged is improbable"); *see also Neitzke v. Williams*, 490 U.S. 319, 327 (1989) ("Rule 12(b)(6) does not countenance ... dismissals based on a judge's disbelief of a complaint's factual allegations"). Indeed, in assessing the sufficiency of a complaint, the court must determine only whether "'the claimant is entitled to offer evidence to support the claims,' not whether the plaintiff can ultimately prove the facts alleged." *See United States v. SouthEast Eye Specialists, PLLC*, 570 F. Supp. 3d 561, 574 (M.D. Tenn. 2021) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002)).

B.      Legislative Immunity

The Sixth Circuit has recognized a board of education engages in legislative activity when it makes budgetary decisions that eliminate a school. *Smith v. Jefferson Co. Bd. Of School Comm'rs*, 641 F.3d 197, 217 (2011). "Although plaintiffs may sue a local legislator in his or her *official* capacity under § 1983, local legislators may invoke legislative immunity to insulate themselves as *individuals* from liability based on their legislative activities." *Id.* at 218 (emphasis in original) (citing *Bogan v. Scott–Harris*, 523 U.S. 44, 49 (1998); *Canary v. Osborn*, 211 F.3d 324, 328 (6th Cir. 2000) (citation omitted)). Thus, where the board of education is performing a legislative function, they are entitled to legislative immunity in their individual capacities.

14

Plaintiff argues that legislative immunity does not attach to her personal capacity claim because Defendants' conduct was not "legitimate legislative activity."  This is so, according to Plaintiff, because Cotton exceeded the scope of his legislative duties as member of the Board of Education and violated the separation of powers doctrine.  When the Board members determined that deeper cuts to the budget were needed, instead of returning the matter to Administration for re-evaluation, Cotton, in violation of policy and past practices, created a "Treasurer's Compilation" based on trustee recommendations, representing additional cuts, including the positions of Communications Coordinator.  (ECF No. 26, ¶¶ 115-116).  According to District policy and past practices, once the cost savings amount is established by the Board, it is within the sole discretion of the Administration to decide the best way to implement those reductions.  *Id*. at ¶ 117.  In accordance with the policy and past practices, the Superintendent proposed a budget on May 16, 2023 that did not eliminate Brush's position.  *Id*. at ¶ 118.  According to the Amended Complaint, Brush was the only District employee specifically targeted for elimination in the "Treasurer's Compilation" proposed by Cotton and co-signed by Papas.  *Id*. at ¶ 120.  On May 22, 2023, four members of the Board (Cotton, Papas, Jeup and Ismail), contrary to policy and past practices, rejected the recommendations of the Superintendent

and imposed their own budget through a Resolution entitled "Trustee-Initiated Budget Adjustment" developed by Cotton and Papas.  *Id*. at ¶ 122.  The Trustee-Initiated Budget Adjustment called for the elimination of Brush's Communications Coordinator position.  *Id*. at ¶ 123.

In *Canary v. Osborn*, 211 F.3d 324, 328 (6th Cir. 2000) the Sixth Circuit ruled that individual members of an Ohio Board of Education were not entitled to absolute legislative immunity because a resolution to terminate a whistleblower "did not bear all the hallmarks of traditional legislation."  Applying *Bogan*, the Sixth Circuit concluded that "the action in substance was not essentially and clearly legislative," based on several factors.  *Id*. at 330.  First, although the school board attributed their vote to "budgetary priorities," the court found that "the record does not otherwise reflect that the decision was one 'implicating the budgetary priorities of the city and the services the city provides to its constituents.'"  *Id*. at 330 (citing *Bogan*, 523 U.S. at 55).  Second, "the resolution did not "involve the termination of a position," because the school board replaced the eliminated employee.  *Id*.  Third and similarly, "the record reflects that the alleged action in this case did not have 'prospective implications that reach[ed] well beyond the particular occupant of the office,'" because the employee's position was replaced.  *Id*. at 330–31 (quoting *Bogan*, at 55).

Similarly here, although Cotton has claimed Brush was eliminated for budgetary reasons, the facts in the complaint suggest that the decision to remove Brush did not implicate the budget.  The Administration's budget retained Brush while meeting the Board's financial goals.  (ECF No. 26, ¶ 113).  Further, the need to replace Brush with another staff member, coupled with Cotton's proposal to add funds for marketing and branding studies to replace Brush's duties, demonstrate that no money was saved by terminating Brush.  *Id*. ¶¶ 144-145; ECF No. 26-1).  And because Brush had to be replaced, Defendants' actions did not "involve the termination of a position" and did not have "'prospective implications that reach[ed] well beyond the particular occupant of the office."  Plaintiff has sufficiently alleged that eliminating Brush's position was not a legitimate legislative activity and thus Defendants are not entitled to legislative immunity at this juncture.

C.    Qualified Immunity

Qualified immunity protects government officials from liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  To survive the motion to dismiss on qualified-immunity grounds, the plaintiff must allege facts that "plausibly mak[e]

out a claim that the defendant's conduct violated a constitutional right that was clearly established [by] law at the time, such that a reasonable [official] would have known that his conduct violated that right." *Johnson v. Moseley*, 790 F.3d 649, 653 (6th Cir. 2015).  Therefore, in analyzing the issue of qualified immunity, the "first step is to determine if the facts alleged make out a violation of a constitutional right.  The second is to ask if the right at issue was 'clearly established' when the event occurred such that a reasonable officer would have known that his conduct violated it." *Martin v. City of Broadview Heights*, 712 F.3d 951, 957 (6th Cir. 2013) (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)).  The two prongs can be addressed in any order.  *Pearson v. Callahan*, 555 U.S. at 236.  Qualified immunity shields an officer's actions if either inquiry is answered in the negative.  *Martin*, 712 F.3d at 957.

### 1.    Substantive Due Process

Substantive-due-process challenges usually do not survive if a provision of the Constitution directly addresses the allegedly illegal conduct at issue.  *Smith v. Jefferson Cnty. Bd. of Sch. Comm'rs*, 641 F.3d 197, 217 (6th Cir. 2011) (citing *Montgomery v. Carter County*, 226 F.3d 758, 769 (6th Cir. 2000)).  The Sixth Circuit has observed that

> the Supreme Court has repeatedly cautioned that the
> concept of substantive due process has no place when a

18

provision of the Constitution directly addresses the type of illegal governmental conduct alleged by the plaintiff. *See, e.g., Graham v. Connor*, 490 U.S. 386, 394–95 (1989) (concluding that the reasonableness or unreasonableness of force used by police during an investigatory stop or arrest must be analyzed as a Fourth Amendment claim, rather than under "the more generalized notion of 'substantive due process'").

*Id*. (quoting *Montgomery*, 226 F.3d at 769).  Generally, under *Graham*, where a First Amendment retaliation claim directly addresses the conduct at issue, the substantive-due-process claim must be dismissed.  However, it is true that the Sixth Circuit has acknowledged that the viability of a retaliation claim does not "automatically preclude[ ] any substantive due process claim that touches on the same conduct."  *Beal v. Vanalstine*, No. 24-1224, 2024 WL 5482662, at *4 (6th Cir. Nov. 20, 2024).  To determine whether a due process claim merges with another constitutional claim, courts "should evaluate whether the conduct would not be 'shocking' under the substantive due process test but for the violation of an enumerated constitutional right; if so, that enumerated right governs instead of due process."  *Howard v. Livingston Cnty.*, No. 21-1689, 2023 WL 334894, at *12 (6th Cir. Jan. 20, 2023).  In *Howard*, for instance, the court of appeals determined that the plaintiff's allegations that the defendants intentionally conducted an unfounded criminal prosecution against her stood apart from her claim that the prosecution was retaliatory.  *Id.* at *13 ("Howard's allegations that Defendants

19

intentionally subjected her to a sustained malicious prosecution can shock the conscience regardless of whether they did so in retaliation for her protected speech."). Here, the Amended Complaint alleges that Brush's substantive due process rights were violated because the loss of her employment due to her political beliefs and affiliations shocks the conscience. (ECF No. 26, ¶ 155). The Amended Complaint is clear that the harm is that Defendants were punishing Brush for her political beliefs by eliminating her position. But for this act of retaliation, the Defendants actions would not shock the conscience. Accordingly, the Amended Complaint does not make out a separate due process claim and this claim must be dismissed. Because this claim fails on the first prong of the qualified immunity test, the court need not address the second prong.

### 2. First Amendment Retaliation

To prevail on a First Amendment retaliation claim, a plaintiff must show that (1) the First Amendment protected their conduct; (2) an adverse action was taken against them that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by their protected conduct. *Bell v. Johnson*, 308 F.3d 594, 602 (6th Cir. 2002) (quoting *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999)). Defendants

20

argue that Plaintiff has not plausibly pleaded that her protected speech (her political affiliation) was a substantial or motivating factor in the adverse employment action (the termination of her employment).

Determining whether a causal connection has been adequately alleged in the complaint requires a "two-part inquiry: A plaintiff must show both (1) that the adverse action was proximately caused by an individual defendant's acts, but also (2) that the individual taking those acts was 'motivated in substantial part by a desire to punish an individual for exercise of a constitutional right.'" *King v. Zamiara*, 680 F.3d 686, 695 (6th Cir. 2012) (quoting *Thaddeus–X v. Blatter*, 175 F.3d 378, 396 (6th Cir. 1999)).  The Sixth Circuit has found two factors especially helping in determining whether motive existed: (1) whether the defendant knew of the plaintiff's protected conduct; and (2) whether "the chronology of events supports an inference of causation," such as temporal proximity between the speech and the adverse action.  *Bright v. Gallia County, Ohio*, 753 F.3d 639 (6th Cir. 2014) (citation omitted).

Brush alleges that Defendants Cotton, Jeup and Pappas targeted her for job elimination because they perceived her to be a political enemy who was politically aligned and closely associated with the progressive voices on the board and in the community, and a strong supporter of DEI principles.  (ECF No. 26, ¶ 148).  The

21

Amended Complaint alleges that Defendant Ismail "aided and abetted" a violation of Brush's constitutional right because he knew that Cotton, Jeup, and Papas were targeting Brush based on her perceived political affiliations.  *Id*. at ¶ 149.

Defendants argue that there are no factual allegations to support causation. More specifically, Defendants argue that the Amended Complaint does not contain sufficient factual allegations regarding their knowledge of her political beliefs.  The court concludes, however, that the Amended Complaint contains sufficient factual allegations from which knowledge of Brush's political affiliation may be inferred.  The Amended Complaint alleges that Brush was the only District employee targeted for elimination in the Treasurer's Compilation proposed by Cotton and co-signed by Papas (ECF No. 26, ¶¶ 120, 121) and on May 22, 2023, Defendants rejected the recommendations of the Superintendent (which retained Brush) and imposed their own budget through a resolution entitled "Trustee-Initiated Budget Adjustment" developed by Cotton and Papas (*Id*. at ¶ 122).  On that same date, members of the public who addressed the Board were critical of Cotton and Papas's activities because they were "perceived as clandestinely targeting Brush for political reasons."  (ECF No. 26, ¶ 124).  A plausible inference may be drawn that all individual Defendants were aware of Brush's political affiliation (or perceived political affiliation) based on the public comments in this

22

regard at the May 22, 2023 meeting.  Approximately one month later, at an open meeting of the Board on June 20, 2023, the four individual Defendants voted to eliminate Brush's position, over two motions to retain her position.  (ECF No. 26, ¶ 131).  These allegations, as a whole, take Defendants' knowledge of Brush's political affiliation from speculative to plausible.

Defendants next argue that the circumstances dispel any inference of retaliation.  That is, any inference of a retaliatory motive based on Brush's circumstantial evidence of retaliatory motive is overcome by the legitimate, non-retaliatory reasons for eliminating her position – the GPPSS budget crisis. Defendants' arguments in this regard are not applicable in the context of a motion to dismiss, which focuses on plausibility of a plaintiff's claim, not on whether a plaintiff has sufficiently pleaded around a defendant's affirmative defenses. *Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 547 (6th Cir. 2012) ("a plaintiff generally need not plead the lack of affirmative defenses to state a valid claim, see Fed. R. Civ. P. 8(a) (requiring "a short and plain statement of the *claim*" (emphasis added)); *see* Defendants Cotton, Ismail, and GPPSS's Answer to Complaint and Affirmative Defenses, ECF No. 8, Affirmative Defense No. 8 ("Legitimate, non-retaliatory reasons existed supporting Defendants' conduct which was based on good business judgment and in strict compliance with all pertinent Michigan

Law."); Defendant Jeup and Papas' Answer to Complaint and Affirmative Defenses,

ECF No. 12, Affirmative Defense No. 8 ("Legitimate, non-retaliatory reasons

existed supporting Defendants' conduct which was based on good business

judgment and in strict compliance with all pertinent Michigan Law.").  Additionally,

the cases on which Defendants rely to support this claim are in the procedural

posture of summary judgment, not a motion to dismiss.[1]  Thus, Defendants seek

to hold Brush to a summary judgment standard, which simply does not apply here

in the context of a motion to dismiss or for judgment on the pleadings.

Next, Defendants argue that Plaintiff's right to be free from retaliation in

the circumstances alleged was not clearly established at the time of her

termination.  A clearly established right must be described to a reasonable degree

of certainty in Supreme Court or lower court precedent:

> For a right to be clearly established, the contours of the
> right must be sufficiently clear that a reasonable official
> would understand that what he is doing violates that
> right.... In determining whether a constitutional right is
> clearly established, we look first to decisions of the
> Supreme Court, then to decisions of this court and other
> courts within our circuit, and finally to decisions of other
> circuits.

---

[1] *Nguyen v. City of Cleveland*, 229 F.3d 559 (6th Cir. 2000) (deciding summary judgment); *Kuhn v. Washtenaw Cnty.*, 709 F.3d 612 (6th Cir. 2013) (deciding summary judgment); *Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392 (6th Cir. 2010) (deciding summary judgment); *Hartsel v. Keys*, 87 F.3d 795 (6th Cir. 1996); *Bender v. Hecht's Dep't Stores*, 455 F.3d 612 (6th Cir. 2006) (deciding summary judgment); *Lahar v. Oakland Cnty.*, 304 F. App'x 354 (6th Cir. 2008) (deciding summary judgment).

24

*Benison v. Ross*, 765 F.3d 649, 664 (6th Cir. 2014) (quoting *Bell v. Johnson*, 308 F.3d 594, 601–02 (6th Cir. 2002)).  Under *Branti v. Finkel*, 445 U.S. 507 (1980), it is well established that a public employee may not be terminated based on their political beliefs or their political affiliation because that is constitutionally protected conduct.  And in 2012, the Sixth Circuit held that retaliation based on perceived political affiliation is actionable under the political-affiliation retaliation doctrine. *Dye v. Off. of the Racing Comm'n*, 702 F.3d 286, 300 (6th Cir. 2012).  These cases go beyond the general right "not to suffer an 'abridgement' of the 'freedom of speech.'"  *Hall v. Navarre*, 118 F.4th 749 (6th Cir. 2024).  As discussed in more detail below, the court cannot determine at this stage of the proceedings whether Plaintiff's position falls within an *Elrod/Branti* exception and thus it cannot determine whether it was clearly established that Defendants could not terminate Plaintiff.  *See McCloud v. Testa*, 97 F.3d 1536, 1558 (6th Cir. 1996).

     E.     <u>*Elrod/Branti* Confidential Employee Exception</u>

The Supreme Court has explained that a public employee can be discharged for their political beliefs or political affiliations when the employee is considered a confidential or policymaking employee.  *Elrod v. Burns*, 427 U.S. 347, 367 (1976); *Branti v. Finkel*, 455 U.S. 507, 517 (1980).  There are four categories of employees to which this exception applies:

25

> Category One: positions specifically named in relevant federal, state, county, or municipal law to which discretionary authority with respect to the enforcement of that law or the carrying out of some other policy of political concern is granted;
>
> Category Two: positions to which a significant portion of the total discretionary authority available to category one position-holders has been delegated; or positions not named in law, possessing by virtue of the jurisdiction's pattern or practice the same quantum or type of discretionary authority commonly held by category one positions in other jurisdictions;
>
> Category Three: confidential advisors who spend a significant portion of their time on the job advising category one or category two position-holders on how to exercise their statutory or delegated policymaking authority or other confidential employees who control the lines of communications to category one positions, category two positions or confidential advisors;
>
> Category Four: positions that are part of a group of positions filled by balancing out political party representation, or that are filled by balancing out selections made by different governmental agents or bodies.

*Peterson v. Dean*, 777 F.3d 334, 343 (6th Cir. 2015).  Defendants bear the burden of showing that the position is of a type that would qualify for the exception. *Summe v. Kenton County Clerk's Office*, 604 F.3d 257, 265 (6th Cir. 2010).

Defendants argue that Brush's position falls within Category Three.  The officeholder in question is the Superintendent, however, not the Board.  Brush

reported to the Superintendent, (ECF No. 26, ¶¶ 16-17), who did not want to terminate her. *Id*. ¶¶ 112-130; ECF No. 26-1. Indeed, the Superintendent resisted Cotton's proposal to cut Brush's role. *Id*. Defendants cite no authority for the proposition that the Board can terminate the confidential advisor of a Category One or Two position based on political affiliation. Nor do Defendants cite any authority that a Category Three advisor's loyalty in these circumstances would be to the Board, not the Superintendent. At this stage of the proceedings, the court finds that Defendants cannot meet their burden that the exception applies.

Additionally, at this stage of proceedings, the court cannot conclude that Brush was a confidential employee to which the exception applies. "In determining whether an employee falls into one of these categories, [courts] must examine the inherent duties of the position, rather than the actual tasks undertaken by the employee." *Latham v. Office of the Attorney General of the State of Ohio*, 395 F.3d 261, 267 (6th Cir. 2005); *Monks v. Marlinga,* 923 F.2d 423, 425 (6th Cir. 1991) (stating that the "relevant focus of analysis is the inherent duties of the position in question, not the work actually performed by the person who happens to occupy the office"). The court finds that, at this stage in the litigation, it cannot say Plaintiff constitutes a Category Three confidential or policymaking employee for purposes of the *Elrod/Branti* exception as a matter of

27

law.  While the court has before it Plaintiff's allegations regarding her job duties as she performed them in the Amended Complaint, nothing in the record describes the "inherent duties" of Plaintiff's position.  For example, there is no written job description in the record that defines the duties of a Communications Coordinator for the GPPSS.  Nor is there any authorizing statute that defines the job duties of a Communications Coordinator.  Regardless of any allegations in the complaint regarding the tasks Plaintiff actually performed while employed as a Communications Coordinator, nothing in the record sheds light on the "inherent duties" of Plaintiff's position.  Thus, the court finds it is unable, at this stage in the litigation, to make a determination as to whether Plaintiff was a confidential or policymaking employee for purposes of *Elrod/Branti*.  *See McCloud v. Testa*, 97 F.3d 1536, 1558 (6th Cir. 1996) (noting that "in the situation where the inherent duties of the plaintiffs' positions are not apparent and the facts are not yet fully developed, it is not possible for us to decide, when reviewing in an interlocutory posture the denial of a motion for summary judgment, whether a defendant should be granted qualified immunity").

      F.    <u>*Monell* Claim</u>

"To prevail in a § 1983 suit against a municipality, a plaintiff must show that the alleged federal right violation occurred because of a municipal policy or

custom."  *Thomas v. City of Chattanooga,* 398 F.3d 426, 429 (6th Cir. 2005) (citing

*Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)).  In other words, "[a]

municipality 'may not be sued under § 1983 for an injury inflicted solely by its

employees or agents.'"  *Id*. (quoting *Monell*, 436 U.S. at 694).  There are four

traditional ways of proving the existence of an illegal policy or custom: "(1) the

existence of an illegal official policy or legislative enactment; (2) that an official

with final decision making authority ratified illegal actions; (3) the existence of a

policy of inadequate training or supervision; or (4) the existence of a custom of

tolerance or acquiescence of federal rights violations."  *Wright v. City of Euclid,*

*Ohio*, 962 F.3d 852, 880 (6th Cir. 2020) (quoting *Jackson v. City of Cleveland*, 925

F.3d 793, 828 (6th Cir. 2019)).

Defendant GPPSS argues that if there is no underlying constitutional

violation, then there can be no *Monell* liability.  As the Supreme Court explained in

*Ashcroft v. Iqbal*, 556 U.S. 662, 667 (2009), there is no vicarious or respondeat

superior liability under § 1983.  Thus, for example, in the context of a municipality,

a plaintiff cannot establish the municipality's liability unless he shows that

"deliberate action attributable to the municipality directly caused a deprivation of

federal rights."  *Board of County Comm. v. Brown*, 520 U.S. 397, 415 (1997).

Rather, in the context of a claim against a municipality, a plaintiff must establish

29

both (1) an underlying violation of his constitutional rights, and (2) that the violation resulted from the municipality's own deliberately indifferent policies. GPPSS's sole argument on the insufficiency of the *Monell* claim is that Brush's underlying constitutional claim fails.  However, the court has found that Plaintiff has stated a claim for First Amendment retaliation.  Accordingly, Defendant's sole basis for seeking dismissal of the *Monell* claim is without merit and the claim must stand.

## IV.    CONCLUSION

For the reasons set forth above, the motions to dismiss the amended complaint are **GRANTED** in part and **DENIED** in part.

**SO ORDERED**.

Date: February 4, 2026                             s/F. Kay Behm
                                                   F. Kay Behm
                                                   United States District Judge

30